ALLEN I. KUTCHINS, Plaintiff-Appellee, v. ALLEN C. BERG *et al.*, Defendants-Appellants.

First District (4th Division)   No. 1—92—2629

Opinion filed June 30, 1994.

Hinshaw & Culbertson, of Chicago (Paul L. Pawlowski and Joshua G. Vincent, of counsel), for appellants.

Vedder, Price, Kaufman & Kammholz, of Chicago (Donald W. Jenkins and James A. Morsch, of counsel), for appellee.

JUSTICE JOHNSON delivered the opinion of the court:

Plaintiff filed this defamation action in the circuit court of Cook County seeking damages for injuries to his reputation allegedly caused by statements made by defendants. Following trial, the jury found in plaintiff's favor and awarded him compensatory and punitive damages in the amount of $661,636. Defendants appeal, alleging that the trial court committed numerous errors by (1) striking their affirmative defense of qualified privilege; (2) denying their motion for a directed verdict as to one alleged defamatory statement; (3) admitting evidence concerning both the issue of malice and plaintiff's purported lost income; and (4) failing to declare a mistrial based on plaintiff's violations of the trial court's *in limine* orders.

We reverse and remand.

The evidence presented at trial reveals that on July 1, 1980, plaintiff, Allen I. Kutchins, and defendant, Allen C. Berg, formed Kutchins, Berg & Co., a professional accounting firm, now known as Berg, DeMarco, Lewis, Sawatski & Co. (hereinafter the firm). Ron Lewis joined the firm approximately one month later, and Steve Sa-

watski and Mike DeMarco joined in 1983. Plaintiff served as the firm's president until Berg became president in 1982. During the next two years, the firm grew in size to over 20 employees and in annual billings to more than $1.5 million. Also during this period, Berg's clients were generating more than twice the revenue for the firm than were plaintiff's clients.

In September 1985, several of plaintiff's clients, including Richard Driehaus, terminated plaintiff as their accountant. Approximately two months later, Driehaus' attorney, Marshall Eisenberg, wrote plaintiff alleging that he (plaintiff) had converted approximately $19,000 from Driehaus. Eisenberg also sought a refund of $16,000 for work not performed by plaintiff and an immediate reimbursement of $20,000 for other "questionable charges." Eisenberg threatened the firm with legal action if Driehaus' claims were not resolved within one week. After reading the letter, plaintiff believed the questionable charges referred to two $10,000 checks Driehaus had given to plaintiff in 1983 and 1984 as gifts. Plaintiff subsequently placed the letter on Berg's desk. Prior to that time, plaintiff had not informed other members of the firm of the $10,000 checks from Driehaus.

On December 16, 1985, Berg read the letter from Eisenberg and unsuccessfully attempted to reconcile the disputed charges in the firm's records. He then met with the firm's shareholders and disclosed the contents of the letter to them. When asked to explain the "questionable charges," plaintiff wept and admitted that they concerned two $10,000 gifts he accepted from Driehaus. Plaintiff also admitted that he had charged one of Driehaus' business entities more than the fee it initially agreed to pay. The next day, Berg removed plaintiff as a signatory from the firm's bank account and ordered a review of all financial statements and tax returns prepared by plaintiff. He also proposed changing the firm's name, removing plaintiff as an officer, and restructuring the firm's stock ownership. On December 19, 1985, plaintiff resigned from the firm. Later that day, Eisenberg telephoned Berg and offered to abandon Driehaus' claims if plaintiff was allowed to remain with the firm. However, Berg indicated that he could no longer work with plaintiff and rejected Eisenberg's offer.

On December 21, 1985, the firm's shareholders met to discuss the reassignment of plaintiff's remaining clients. Plaintiff cooperated and agreed to discuss the reassignments with his clients and inform them as to why he was leaving the firm. They also discussed how plaintiff would be compensated for his stock and future referrals. At the end of the meeting, plaintiff understood that he was to begin contacting his clients to discuss the transfer of their work to other members of

the firm. Two days later, Berg left for a preplanned family vacation in Florida.

On December 30, 1985, Berg learned from members of the firm that plaintiff had failed to begin meeting with his clients to inform them regarding the reassignment of their work. Berg then dictated a memorandum from Florida which was given to plaintiff back at the firm. In the memorandum, Berg alleged that if plaintiff failed to cooperate as promised on December 21, 1985, the firm would be "forced to go public with his transgressions." After receiving the memorandum, plaintiff left the firm's office and never returned.

Berg returned from his vacation on January 6, 1986, and began contacting plaintiff's clients. On January 13, 1986, he and Sawatski met with the owners of Fire Control, Inc., a client developed by plaintiff. Berg told them that plaintiff improperly accepted money from a client which plaintiff considered a gift to him personally. Although Berg stated that the money should have been regarded as compensation to the firm, he did not say that plaintiff embezzled the money. Subsequently, Berg and Sawatski met with another one of plaintiff's clients, Bob Geras. Berg told him that plaintiff was involved in some "highly irregular activities." Geras told Berg and Sawatski that he knew of the Driehaus controversy because plaintiff had previously consulted him about the matter.

On March 10, 1986; plaintiff filed a six-count complaint against Berg and the firm alleging defamation and intentional infliction of emotional distress. Plaintiff later filed an amended complaint asserting additional claims all of which were settled before trial. He then filed a second amended complaint alleging defamation. In their answer to the complaint, defendants raised the affirmative defense of qualified privilege defense and also asserted that the statements complained of were substantially true.

Prior to trial, the trial court struck the qualified privilege defense as a matter of law. Following trial, the jury returned its verdict in plaintiff's favor and awarded him $250,000 in general damages and $311,636 in special damages. The jury also awarded plaintiff $100,000 in punitive damages. Defendants filed post-trial motions for judgment notwithstanding the verdict and for a new trial, both of which the trial court denied. Defendants then filed this appeal.

Defendants contend that the trial court committed several errors which deprived them of a fair trial and which also improperly affected the damages awarded. Following our review of the record, we agree with defendants that plaintiff repeatedly violated the trial court's *in limine* orders barring any mention of an alleged conversation between plaintiff and his deceased daughter. Because we believe

that plaintiff's flagrant violations of the trial court's *in limine* orders deprived defendants of a fair trial, we must reverse the judgment of the trial court.

Prior to trial, defendants moved to bar any reference to the fact that plaintiff's eight-year-old daughter suffered from a terminal illness and ultimately died. Plaintiff objected and argued that he suffered shame and humiliation when his daughter asked him whether he had been kicked out of his accounting firm because he stole money. He argued that his daughter's question was relevant to the issues. In response, defendants argued that the question was hearsay and, therefore, inadmissible. Consequently, the trial court granted defendants' motion *in limine*.

At trial, plaintiff testified on direct examination that his daughter came back from a birthday party where she was told that he was caught stealing from the firm. The trial court sustained defendants' objection. On redirect examination, counsel asked plaintiff who had told his daughter about his reason for leaving the firm. Again, the trial court sustained defendants' objection.

Later at trial, plaintiff's counsel asserted during closing argument that plaintiff testified that his daughter came home from a birthday party where Berg's daughter mentioned that plaintiff had stolen money from the firm. Following plaintiff's closing argument, defendants moved for a mistrial. The trial court denied defendants' motion. The trial court also denied defendants' motion for a new trial which alleged, *inter alia*, that plaintiff's repeated violations of the *in limine* order denied them a fair trial.

■ A motion *in limine* allows a litigant to obtain a pretrial order which excludes inadmissible evidence and bars any questioning of witnesses regarding such evidence. (*Rutledge v. St. Anne's Hospital* (1990), 230 Ill. App. 3d 786, 792.) In this way, the moving party safeguards against the prejudicial impact possibly resulting from asking questions and making objections regarding the inadmissible evidence before the jury. (*Lundell v. Citrano* (1984), 129 Ill. App. 3d 390, 396.) Where a litigant clearly violates an *in limine* order which was specific in its terms, and the violation denied the opposing party a fair trial, a new trial should be granted. (*Brown v. Bozorgi* (1992), 234 Ill. App. 3d 972, 976.) The trial court's decision to grant or deny a new trial should not be disturbed absent a clear abuse of discretion. *Bozorgi*, 234 Ill. App. 3d at 978.

■ In the present case, we believe that the trial court abused its discretion in denying defendants' motion for a new trial. We find that the *in limine* order was specific in its prohibition. While the order specifically barred any reference to plaintiff's daughter's illness

and death, it also incorporated any reference to the alleged conversation between them based on plaintiff's argument in opposition to the *in limine* order being granted. This view is supported by the fact that, at trial, the trial court twice sustained defendants' objections to plaintiff's questions concerning the alleged conversation.

Moreover, plaintiff's counsel was aware that the *in limine* order included his alleged conversation with his daughter given that the trial court sustained defendants' first objection to the question regarding the conversation. Hence, we believe that counsel's subsequent attempts to question plaintiff concerning the purported conversation prejudiced defendants' rights to a fair trial. See *Geisberger v. Quincy* (1972), 3 Ill. App. 3d 437, 441 (wherein this court held that prejudice was demonstrated by the defense counsel's repeated attempts to question a witness regarding inadmissible evidence).

In addition, we are persuaded that defendants were further prejudiced by counsel's reference to the inadmissible evidence during closing argument. In making his closing argument, counsel incorrectly informed the jury that plaintiff testified his daughter came home from a birthday party where Berg's daughter stated that plaintiff stole money from the firm. Our review of the record reveals that plaintiff did not testify that Berg's daughter told his daughter about the incident at the firm. Attempts to offer and argue incompetent evidence before the jury after it has been ruled inadmissible constitute prejudicial error. (*Gillson v. Gulf, Mobile & Ohio R.R. Co.* (1969), 42 Ill. 2d 193, 200.) Therefore, we believe that the prejudice suffered by defendants as a result of plaintiff's repeated violations of the *in limine* order was exacerbated by counsel's misstatement of the evidence.

Since defendants were denied a fair trial based on plaintiff's repeated violations of the *in limine* order, we hold that the trial court abused its discretion in denying their motion for a new trial. In light of our determination that a new trial is warranted, a review of defendants' other contentions is unnecessary.

For the foregoing reasons, the judgment of the trial court is reversed and this cause is remanded to the trial court for a new trial.

Reversed and remanded.

HOFFMAN, P.J., and THEIS, J., concur.