# Illinois Official Reports

## Appellate Court

---

### *Sikora v. Parikh*, 2018 IL App (1st) 172473

---

| | |
|---|---|
| Appellate Court Caption | MARY SIKORA, as Independent Administrator of the Estate of Chris Allan Sikora, Deceased, Plaintiff-Appellee, v. NIRALI R. PARIKH, M.D., and MANOR CARE OF ELK GROVE VILLAGE IL, LLC, a Foreign Limited Liability Company, d/b/a ManorCare of Elk Grove Village, Defendants (Nirali R. Parikh, M.D., Defendant-Appellant). |
| District & No. | First District, Fourth Division<br>Docket No. 1-17-2473 |
| Filed | September 28, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-L-8881; the Hon. Thomas J. Lipscomb, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Linda J. Hay, Susan M. Wagener, and Robert E. Elworth, of HeplerBroom, LLC, of Chicago, for appellant.<br><br>Jason M. Kellerman, David M. Resis, and Steven J. Malman, of Law Offices of Steven J. Malman & Associates, P.C., and Leslie J. Rosen, of Leslie J. Rosen Attorney at Law P.C., both of Chicago, for appellee. |

JUSTICE BURKE delivered the judgment of the court, with opinion.
                    Justices Ellis concurred in the judgment and opinion.
                    Justice Gordon specially concurred, with opinion.


## OPINION

Plaintiff Mary Sikora, as independent administrator of the estate of Chris Allan Sikora (Sikora), deceased, brought a lawsuit against defendants, Nirali R. Parikh, M.D., and Manor Care of Elk Grove Village IL, LLC, d/b/a ManorCare of Elk Grove Village (ManorCare), following the death of her husband from a pulmonary embolism. The case proceeded to a jury trial, where the jury rendered a verdict in favor of both defendants. Plaintiff thereafter moved for a new trial based, in part, on Dr. Parikh's closing argument, where her attorney asked the jury to place itself in Dr. Parikh's shoes and allegedly violated a pretrial *in limine* order, which had barred any mention of Sikora's initial refusal to be transferred to the hospital on the day he passed away. The trial court agreed that Dr. Parikh's attorney had made improper remarks during closing argument and found the cumulative effect of those errors sufficiently prejudicial to warrant a new trial.

Dr. Parikh now appeals the trial court's grant of a new trial, arguing that her attorney's statements in closing argument did not deny plaintiff a fair trial and, thus, did not warrant a new trial. For the reasons that follow, we affirm the trial court's order granting a new trial.

### I. BACKGROUND

#### A. Pretrial

Plaintiff's second amended complaint frames the issues on appeal. In that complaint, she brought survival and wrongful death causes of action against Dr. Parikh and ManorCare. She also brought a claim that ManorCare violated the Nursing Home Care Act (210 ILCS 45/1-101 *et seq.* (West 2012)). The allegations were all based on Dr. Parikh's failure to diagnose and treat Sikora's pulmonary embolism and ManorCare's nurses' failure to inform Dr. Parikh of changes in his physical condition. The complaint alleged that these failures contributed to, or caused, Sikora's death on April 9, 2013, from a pulmonary embolism.[1]

Both defendants denied the alleged negligence and neither raised an affirmative defense.[2]

As the case proceeded toward a jury trial, the parties submitted several motions *in limine*. Relevant here is plaintiff's ninth motion *in limine*, wherein she requested that defendants' expert witnesses be barred from testifying about Sikora's initial refusal to be transferred to the hospital on the day he passed away.

During the hearing on the motion, it came to light that around 11:50 a.m. on the day Sikora passed away, a nurse practitioner at ManorCare recommended that he be transferred to the

---

[1]ManorCare and plaintiff reached a settlement after trial, and as a result, ManorCare is no longer a party to the litigation.

[2]Although only Dr. Parikh's answer to plaintiff's second amended complaint is included in the record on appeal, it is clear from other parts of the record that ManorCare did not raise any affirmative defenses.

hospital. He initially refused but acquiesced apparently within a minute of his initial refusal. Plaintiff argued that, because neither defendant was alleging comparative negligence, Sikora's initial refusal to be transferred to the hospital was irrelevant to the issue of causation, especially because he agreed moments after his initial refusal. Conversely, Dr. Parikh argued that Sikora's initial refusal was relevant because plaintiff's theory of the case was that Dr. Parikh should have taken various steps to diagnose and treat Sikora's pulmonary embolism within a "very tight timeframe [*sic*]" and any deviation in this time frame could have prevented him from obtaining lifesaving treatment. The trial court granted the motion, finding Sikora's initial refusal to be transferred to the hospital irrelevant to the issue of causation and accordingly barred any reference to it during trial.

¶ 9                                    B. Trial

¶ 10    The case proceeded to a jury trial, where the evidence revealed that a pulmonary embolism is a blood clot that has traveled from somewhere in the body through the bloodstream and ended up in a pulmonary artery, where the clot blocks the artery and prevents blood flow. The most common symptoms of a pulmonary embolism are shortness of breath, fatigue, a rapid heart rate, decreased oxygen levels, a stabbing-like chest pain upon breathing, a cough accompanied by blood, a feeling of weakness, and a fever. Many of these symptoms can also indicate pneumonia, including shortness of breath, an elevated heart rate, a feeling of weakness, a fever, and a cough, though the latter two usually are more prominent with pneumonia. But pneumonia also has symptoms that are not associated with a pulmonary embolism, such as a runny nose, a cough with "sputum," a sore throat, and swollen glands. Though common to both a pulmonary embolism and pneumonia, shortness of breath is considered a nonspecific symptom because it can be indicative of several other conditions, as well.

¶ 11    In diagnosing a patient's symptoms, physicians use what is called a differential diagnosis, a rank-order list of the patient's possible conditions. In order to create the list, the physician analyzes the patient's symptoms, medical history, and general demographic information. After analyzing the patient's unique circumstances, the physician ranks the conditions most likely causing the patient's symptoms, encompassing both the mathematically probability of the condition afflicting the patient as well as the seriousness of the condition. The ranking directs the physician's course of action regarding tests and treatment.

¶ 12    In the spring of 2013, the state-of-the-art test to determine if a patient had a pulmonary embolism was a CT pulmonary angiogram, an imaging test that allowed a view of a patient's pulmonary arteries. The test also could determine whether a patient had pneumonia. ManorCare was a nursing home, not a hospital, and because of this distinction, it did not have the capabilities to perform a CT pulmonary angiogram on site. Similarly, ManorCare did not have an X-ray machine nor the ability to test blood on site. All of these tests, however, could be performed at Alexian Brothers Medical Center (Alexian Brothers), a comprehensive stroke center and level two trauma center. Alexian Brothers had radiology technicians on site 24 hours a day and 7 days a week and could perform a CT pulmonary angiogram at a moment's notice with the results transmitted to a patient's physician within 35 minutes.

¶ 13    In early March 2013, Sikora had back surgery at Alexian Brothers. On March 15, 2013, he was transferred to ManorCare for short-term rehabilitation, where Dr. Parikh, a private practice internist, became his attending physician. Upon admission to ManorCare, Sikora had

- 3 -

hypertension, or high blood pressure, and coronary artery disease and was morbidly obese. Because of his hypertension, he took a beta-blocker, which not only helped lower his blood pressure but also lowered his normal pulse rate. Additionally, Dr. Parikh ordered Sikora to be placed on oxygen as needed as a precautionary measure in case he had any shortness of breath.

¶ 14    On March 22, 2013, Sikora had a fever of 103 degrees and an elevated white blood cell count. The following day, he had chills and an oxygen saturation rate of 88%, which was low. As a result, Sikora was transferred to Alexian Brothers, where he was diagnosed with bacterial pneumonia and prescribed antibiotics. Because he would be relatively immobile during his hospitalization, Dr. Parikh prescribed him a low dose of the blood thinner Heparin to try and prevent blood clots.

¶ 15    On March 28, 2013, Sikora was discharged from Alexian Brothers and returned to ManorCare. According to nursing notes, upon being discharged, Sikora did not have any shortness of breath. However, a note from Dr. Schiappa, an infectious disease specialist who treated Sikora at Alexian Brothers that day, indicated that Sikora had shortness of breath with deep breathing. Upon his return to ManorCare, Dr. Parikh continued her order for Sikora to receive oxygen as needed and ordered nursing personnel to call her if his oxygen saturation level fell below 90%. Dr. Parikh also continued his prescription of the low dose of Heparin.

¶ 16    Over the next week and a half, there were no nursing notes indicating that Sikora had any shortness of breath and he did not complain to anyone, including his family, about shortness of breath. However, on April 7, 2013, Lauren Aich, one of Sikora's daughters, visited him and noticed that he was having "a little bit harder time breathing" than normal, but she did not alert the nursing staff about her observation.

¶ 17    The following day, Casmier Grabowski, a physical therapist at ManorCare, helped Sikora with exercises, including walking, stretching, and core strengthening. During the session, Sikora's oxygen saturation levels "fluctuat[ed]" between 88% and 94%, and Grabowski documented in a physical therapy note that Sikora experienced increased shortness of breath.

¶ 18    On the morning of April 9, 2013, between 1 a.m. and 2:30 a.m., a nursing aide helped Sikora use the bathroom, and on his 10-foot walk back to his bed, he complained of shortness of breath. The aide informed Perlita Depakakibo, a ManorCare nurse, about the complaint, and she immediately went to Sikora's room because she understood shortness of breath to be both abnormal and potentially critical. When Depakakibo entered Sikora's room, he was sitting on the side of the bed and feeling weak but alert and responsive with a strong hand grip. She subsequently took his vital signs, which were relatively normal, and assessed his oxygen saturation level, which measured at 95% on room air, also a normal level. Depakakibo suggested to Sikora that he sleep with his bed elevated, but he refused as he was more comfortable lying down. At 2:30 a.m., Depakakibo entered a note in Sikora's chart documenting his condition. In the note, she indicated that Sikora had "slight" shortness of breath. At some point in the early morning, Depakakibo gave Sikora oxygen for comfort, but the record is unclear exactly when he was on it and when he was off it.

¶ 19    At around 3 a.m., Depakakibo took Sikora's temperature, which revealed he had a slightly elevated, or low-grade, temperature of 100.1 degrees when taken from the ear, though his temperature measured 98.9 degrees when taken orally. At the time, Depakakibo observed that Sikora was lying comfortably in bed, but she did not make a note about Sikora's shortness of breath being resolved, something she normally would have done if the shortness of breath had disappeared. A few minutes later, she gave him Tylenol to alleviate his elevated temperature

and noted in his chart that he was comfortable in bed and feeling better. Later in the morning, Depakakibo made rounds and observed that Sikora was sleeping quietly and not exhibiting any signs of shortness of breath, though she never documented this in her notes.

¶ 20    At approximately 5:42 a.m., Sikora's heart rate measured at a stable 65 beats per minute and his respiratory rate, temperature, and blood pressure were normal. Approximately 20 minutes later, plaintiff called ManorCare in response to text messages from Sikora and expressed concern about his well-being.

¶ 21    At approximately 6:05 a.m., Depakakibo called Dr. Parikh and left a voice message stating:

"Apparently [Sikora] developed—He went to the bathroom and coming back to the bed he had shortness of breath. Oxygen is 94 percent room air. So we put him on oxygen. And for some reason he's feeling so weak. So we took the vital signs. His blood pressure is 101 over 70. And I was thinking because he's on blood pressure pill, but it's 101 over 70. But it's okay. But for some reason when we took his lobe temperature, in 30 minutes his temperature is 100.1 [degrees], and that is on the ear; and then by mouth it's 98.9 [degrees]. So I just went ahead and gave the Tylenol.

He's due for INR this morning, but I'm not sure if you want to order some [complete blood count] with a fresh order or [comprehensive metabolic panel] or whatever you think. I'm not sure of the blood culture because the temperature went down now because of the Tylenol. And the family called. They're concerned. But he didn't complain of chest pain, but they want a chest x-ray. I'm not sure if you want it, because he has—He said it's pneumonia, that's when he came from the hospital with pneumonia, and antibiotic was completed. But with a temperature and everything, I'm not sure if you want a chest x-ray."

Depakakibo concluded the message by requesting Dr. Parikh to call back with appropriate orders.

¶ 22    Based on the voice message, according to expert testimony, Sikora's blood pressure was normal for most people but on the low side for him due to his hypertension, his oxygen saturation level was in the normal range, and the description of "room air" meant his oxygen level was measured without the assistance of oxygen.

¶ 23    Sometime before 7 a.m., Dr. Parikh called Depakakibo back, but neither remembered the specifics of their conversation. However, according to Dr. Parikh, based on her custom and practice, she would have asked Depakakibo additional questions concerning Sikora's condition, such as the severity of his shortness of breath, his ability to communicate, his comfort level, and whether he had any additional symptoms.

¶ 24    From Depakakibo's voice message and the additional information Dr. Parikh learned after calling Depakakibo back, Dr. Parikh conducted a differential diagnosis, resulting in pneumonia being placed at the top of her list of the most likely causes of Sikora's symptoms. Dr. Parikh based this determination on his shortness of breath, his recent bout with pneumonia and completion of antibiotics only three or four days prior to the new symptoms, and the fact he was residing in a nursing home, which increased the likelihood of a recurrence of pneumonia. Dr. Parikh also concluded that Sikora did not need to be transferred back to Alexian Brothers because he was stable and progressing in physical therapy, which could be hindered by hospitalization. Though Dr. Parikh knew a pulmonary embolism could be a life-threatening condition, she only had the condition "in the back of [her] mind" as a possible

cause because it was "very unusual" to see a fever in conjunction with a pulmonary embolism and he was on Heparin to prevent blood clots. Ultimately, Dr. Parikh ordered various blood tests and a chest X-ray. While the tests could determine whether Sikora had pneumonia, they would not show a pulmonary embolism, as a CT pulmonary angiogram would. The blood test had to be performed that morning by a phlebotomist from Alexian Brothers, with the testing also done there.

¶ 25    At around 7 a.m., ManorCare had a shift change and a new nurse, Deanna Bucek, began working. Depakakibo informed Bucek of Sikora's issues from earlier in the morning, but according to Depakakibo, she "probably" did not tell Bucek about Sikora's earlier shortness of breath because, when she performed her last rounds, Sikora was "quiet." However, Bucek recalled Depakakibo informing her that Sikora had some "slight" shortness of breath.

¶ 26    At approximately 7:14 a.m., a nursing aide took Sikora's vitals. His temperature was normal, and his blood pressure measured a little low but "still within parameters," according to Bucek. However, his heart rate measured at 100 beats per minute, and his oxygen saturation level was at 88% on room air, which was below normal. Bucek gave Sikora oxygen and rechecked his saturation level, which then measured at 93%. While examining Sikora, he complained of shortness of breath, but she did not call Dr. Parikh.

¶ 27    At around 8 a.m., Holly Sikora, one of Sikora's daughters, arrived at ManorCare and observed her father looking "[m]iserable, fatigued" and having difficulty breathing, unlike anything she had seen before. By 8:58 a.m., Sikora's heart rate had increased to 106 beats per minute, but he did not have a temperature, and according to Bucek, she did not recall him complaining of shortness of breath. Given his condition, Bucek did not call Dr. Parikh.

¶ 28    Between 9 a.m. and 9:30 a.m., Grabowski, the ManorCare physical therapist, came to Sikora's room to perform exercises bedside because Sikora did not want to go to the physical therapy department. Grabowski observed that Sikora was "very fatigued" and "low energy" that morning. During the session, Grabowski monitored Sikora's oxygen saturation levels because Sikora had experienced shortness of breath, but Grabowski did not record the levels because there were no "unusual readings." Grabowski also did not recall Sikora having any "mouth breathing," as such a condition would be a sign of something serious and would have caused Grabowski to stop the physical therapy session. After their session was completed, Grabowski informed the nurse on staff about Sikora's fatigue.

¶ 29    Meanwhile, multiple times between arriving at ManorCare at around 8 a.m. and 11:38 a.m., Holly Sikora went to the nurse's station, asking for someone to check on her father because she thought he was "getting worse."

¶ 30    At around 11:38 a.m., Sikora's blood tests came back as normal, indicating that he did not have pneumonia. After Bucek informed Sikora of his test results, he continued not to feel well, but she still did not sense that he was experiencing shortness of breath. As a result, Bucek rechecked Sikora's vitals, which revealed that his heart rate had increased to 116 beats per minute and his blood pressure had decreased. While Bucek rechecked his vitals, Sikora complained about shortness of breath. Concerned, Bucek subsequently called in Melissa Theodore, a nurse practitioner, which is a nurse who can make medical diagnoses and write orders, and then called Dr. Parikh. In a voice message to Dr. Parikh, Bucek stated that Sikora's laboratory results came back normal, but he was "still having trouble breathing" despite his oxygen saturation level measuring at 93%. Bucek informed Dr. Parikh that Theodore was examining Sikora and asked Dr. Parikh to call back as soon as she could. According to Dr.

Parikh, the voice message was the first time that she had obtained an update on Sikora's condition since she spoke to Depakakibo and ordered the tests.

¶ 31     While examining Sikora, Theodore noted that his blood pressure had decreased even further and his pulse had increased to 138 beats per minute. She recommended that Sikora be transferred to the hospital immediately and called an ambulance at 11:50 a.m. Shortly thereafter, Dr. Parikh called back, and Bucek informed her that Theodore had called an ambulance for Sikora.

¶ 32     The ambulance arrived shortly thereafter and dropped Sikora off at Alexian Brothers' emergency room at 12:36 p.m. Nursing personnel immediately put Sikora on a chest pain protocol, ordering blood tests and a chest X-ray, but they did not order a CT pulmonary angiogram. Approximately 30 minutes later, Dr. Rick Stephani, the emergency room doctor, arrived to see Sikora, but Sikora immediately suffered a cardiac arrest. Sikora was briefly resuscitated but eventually passed away a short time later, with the cause of death being an acute pulmonary embolism.

¶ 33     In addition to the eyewitnesses who testified at trial, several medical experts testified. Plaintiff's experts collectively opined that, when faced with the symptoms, medical history, and relatively immobility of Sikora, Dr. Parikh should have placed a pulmonary embolism higher on her differential diagnosis list than pneumonia, especially considering how a pulmonary embolism can be immediately life-threatening, whereas pneumonia, while still having the potential to be life-threatening, takes longer to develop into such a critical condition. And given the potentially catastrophic consequences of a pulmonary embolism, plaintiff's experts believed that, upon learning of Sikora's symptoms from Depakakibo's voice message and returning Depakakibo's call, Dr. Parikh should have immediately ordered Sikora to be transferred to Alexian Brothers because a CT pulmonary angiogram could not be performed at ManorCare. According to plaintiff's experts, had Sikora been transferred to the hospital sooner, more testing could have occurred simultaneously and within a quicker time frame, which would have allowed him to be diagnosed with a pulmonary embolism. And had he been diagnosed with a pulmonary embolism earlier, doctors could have given him lifesaving treatment.

¶ 34     Conversely, Dr. Parikh and ManorCare's experts testified that her actions on the morning of April 9, 2013, of ordering blood tests and a chest X-ray in order to determine if pneumonia was the cause of Sikora's symptoms were appropriate given his symptoms and medical history. The experts opined that Dr. Parikh did not act improperly when she placed pneumonia above a pulmonary embolism on her differential diagnosis list and decided to keep Sikora at ManorCare rather than be transferred to the hospital because Sikora was stable, he was receiving Heparin to prevent blood clots, and he was at an increased risk of a recurrence of pneumonia due to his circumstances.

¶ 35                           C. Closing Arguments

¶ 36     Following the testimony of the various witnesses, the case proceeded to closing arguments. Prior to the parties delivering their arguments, the trial court informed the jury that, during arguments, the attorneys might provide a summary of the evidence but any argument was "not evidence in and of itself."

¶ 37     Plaintiff's counsel began and argued to the jury that the nurses at ManorCare had multiple opportunities to inform Dr. Parikh of changes in Sikora's condition on the morning in question

but failed to do so at the necessary times. Concerning Dr. Parikh, counsel posited that, based on the 6:05 a.m. voice message from Depakakibo and the ensuing conversation between them less than an hour later, Dr. Parikh should have placed a pulmonary embolism higher on her differential diagnosis list given Sikora's symptoms and the potential deadly consequences from such a condition. According to plaintiff's counsel, Dr. Parikh's standard of care required her to immediately send Sikora to the hospital for testing to determine whether or not he had a pulmonary embolism. Counsel concluded that the failures of ManorCare's nurses to inform Dr. Parikh about Sikora's changes in condition and Dr. Parikh's failure to send Sikora to the hospital immediately after hearing Depakakibo's voice message caused, or contributed to, his death.

¶ 38   In response, Dr. Parikh's counsel asserted that, despite the testimony from plaintiff's experts, their opinions were made on a retrospective basis rather than on a prospective basis, as Dr. Parikh had to do. Counsel focused the jury on what information Dr. Parikh knew based on Depakakibo's voice message and their ensuing conversation when Dr. Parikh returned the call. Counsel then stated: "We've asked you, and I think that the instructions in the law that you're provided with and common sense would dictate that you need to evaluate this case for Dr. Parikh from a prospective analysis. Stand in her shoes on that morning when she—." Plaintiff's counsel interjected and objected to the statement. The trial court sustained the objection and instructed the jury "to disregard standing in somebody's shoes." The court prompted Dr. Parikh's counsel to continue, and she did, asking the jury to "[t]ake yourself back to that time and evaluate from Dr. Parikh's perspective."

¶ 39   Later, Dr. Parikh's counsel attempted to illustrate Dr. Parikh's thought process in arriving at pneumonia as the most likely cause of Sikora's symptoms. Counsel highlighted that Sikora had recently been hospitalized with pneumonia and there was evidence that, upon being discharged from Alexian Brothers, he had experienced shortness of breath, a fact that caused Dr. Parikh's continued oxygen order for Sikora at ManorCare. Counsel further pointed out that, at 6:05 a.m., when Depakakibo left the voice message, Sikora was stable and his condition only deteriorated well after Dr. Parikh ordered the blood tests and chest X-ray.

¶ 40   Dr. Parikh's counsel then used a slide on a projection screen and explained to the jury her "interpretation of what the plaintiff's theory is in this case." Counsel stated: "Once Mr. Sikora agreed to go to the hospital—." Plaintiff's counsel interjected and objected to the statement. The trial court sustained the objection concerning "the agreement" and instructed the jury to strike any mention of an agreement from their notes. Plaintiff's counsel also requested that the slide be taken off the projection screen because the slide read: "Once he agreed to go and did go to the hospital, he would have had a CT scan which would have shown a PE, which would have resulted in some type of therapy (TPA) being given and his life would have been saved." The court agreed, telling Dr. Parikh's counsel to take the slide down and instructed the jury to "[s]trike that first sentence from [their] notes."

¶ 41   Dr. Parikh's counsel continued with her closing argument, observing that, according to plaintiff's theory, had Sikora been transferred to the hospital earlier, he would have received a CT scan, which would have showed a pulmonary embolism and resulted in him being given some type of lifesaving treatment. Counsel asserted that such a chain of events contained "a lot of assumptions" and subsequently delved deeper into those assumptions. Ultimately, counsel argued that Dr. Parikh acted appropriately under the circumstances in putting pneumonia at the top of her differential diagnosis and ordering tests consistent with that diagnosis.

¶ 42       In ManorCare's closing argument, it generally argued that its nurses met their standard of care as there were no significant changes in Sikora's conditions warranting any additional calls to Dr. Parikh.

¶ 43                                              D. Posttrial

¶ 44       Following closing argument, the jury returned a verdict in favor of both Dr. Parikh and ManorCare. The trial court accordingly entered a judgment in favor of them and against plaintiff.

¶ 45       Thereafter, plaintiff filed a motion for a new trial, arguing, in part, that the comment made by Dr. Parikh's counsel during closing argument that the jury should "[s]tand in [Dr. Parikh's] shoes" violated the long-standing rule that it is improper to ask the jury to place itself in the shoes of a party. Although plaintiff acknowledged that the trial court sustained her counsel's objection to the argument, she posited that Dr. Parikh's counsel compounded the impropriety by subsequently asking the jury to take "[t]ake yourself back to that time and evaluate from Dr. Parikh's perspective," a mere variation of the improper comment. Plaintiff also argued that the comment and visual aid from Dr. Parikh's counsel about Sikora agreeing to go to the hospital were improper as they implied that he initially refused to be transferred to the hospital, which violated the trial court's pretrial *in limine* order that had barred any mention of this fact at trial. Plaintiff contended that both violations were reversible error and mandated a new trial.

¶ 46       After plaintiff filed the motion, she and ManorCare settled the case. She accordingly withdrew her motion for a new trial as it related to ManorCare.

¶ 47       Dr. Parikh responded that there was no reversible error in her counsel's comment asking the jury to place itself in Dr. Parikh's shoes because it was not intended to elicit sympathy or arouse the passion of the jury but rather to implore the jury to consider what Dr. Parikh knew at the critical time period. Dr. Parikh also argued that her counsel's comment about Sikora agreeing to go to the hospital did not refer to his initial refusal to be transferred to the hospital. Instead, Dr. Parikh asserted that the comment was merely the beginning of her attempt to refute plaintiff's theory and chronology of how quickly a patient could be transferred to the hospital, receive testing, and obtain appropriate treatment. Dr. Parikh therefore concluded the comment was not improper.

¶ 48       The trial court held a hearing on plaintiff's motion for a new trial. Following the parties' arguments, the court reviewed the law regarding an attorney asking the jury to place itself in the position of one of the parties, violations of *in limine* orders, and when improper remarks during closing argument warrant a new trial. The court added that, although it may sustain an objection and instruct the jury to disregard an improper comment made during closing argument, such an instruction does not necessarily cure the prejudice from the improper comment nor ensure a fair trial.

¶ 49       The trial court subsequently found the comment by Dr. Parikh's counsel asking the jury to stand in Dr. Parikh's shoes on the morning in question "specifically prohibited by case law and clearly improper." Although the court found nothing improper with counsel's subsequent remark asking the jury to take itself back and evaluate the circumstances from Dr. Parikh's perspective, the court stated that the appropriate remark did not cure the wrong from the improper remark. It deemed the improper comment "particularly prejudicial on its face and compounded by Counsel's conflating that highly prejudicial statement with unobjectionable argument."

¶ 50 The trial court next discussed the statement concerning Sikora agreeing to be transferred to the hospital. The court initially remarked that Dr. Parikh's counsel had placed "a medical record" on a projection screen that stated "to the [e]ffect that Plaintiff hadn't agreed to go to the hospital. That medical record referred to and this agreement occurred on the same day that the plaintiff died." The court observed that, following this action, counsel made a similar statement verbally, a direct violation of its *in limine* order. It determined that "[t]he exclusion of evidence about Plaintiff's refusal to be hospitalized necessarily includes his agreement to go to the hospital." The court noted that the central theme of the trial was what Dr. Parikh and the nurses did or failed to do on the morning in question and "[t]o submit evidence that Plaintiff may have control over when he goes to the hospital and thereby caused a delay in his treatment was, to say the least, highly prejudicial. Such evidence could only severely damage Plaintiff's case."

¶ 51 Thereafter, the trial court asserted that it was not concerned as much with "[d]efense counsel's intent" but, rather, "the prejudicial [e]ffect of counsel's remarks." It reiterated that counsel's remark asking the jury to stand in Dr. Parikh's shoes:

> "was unequivocally prohibited by case law and juxtaposition [*sic*] with other argument was extremely prejudicial and warrants a new trial. Moreover, the violation of the Motion *in Limine* submitted irrelevant and highly prejudicial information concerning Plaintiff's delay in his treatment. The cumulative [e]ffect of these matters compels this Court to grant a new trial as these matters cannot be cured by sustained objections and instructions to the jury to disregard."

The court accordingly entered a written order granting plaintiff's motion for a new trial based on the reasons stated in open court.

¶ 52 Dr. Parikh subsequently filed a timely petition for leave to appeal pursuant to Illinois Supreme Court Rule 306(a)(1) (eff. Nov. 1, 2017), which this court granted.

¶ 53 II. ANALYSIS

¶ 54 On appeal, Dr. Parikh contends that the jury's verdict in her favor should be reinstated because the trial court's grant of a new trial was premised upon two statements uttered by her counsel during closing argument that were relatively benign. She argues that her counsel's comment asking the jury to place itself in her shoes on the morning in question was not intended to arouse the passions of, or elicit sympathy from, the jury, but rather to temporally focus it on the critical time period. Similarly, Dr. Parikh argues that her counsel's comment about Sikora agreeing to be transferred to the hospital was not intended to imply that he had initially refused but, rather, to provide context for counsel's subsequent statements about how long the diagnosis and treatment of a pulmonary embolism would have taken at the hospital.

¶ 55 Plaintiff, however, contends that the trial court's grant of a new trial was proper because Dr. Parikh's counsel attempted to invoke the jury's passion and sympathy by asking it to stand in Dr. Parikh's shoes and because counsel verbally and visually violated the court's *in limine* order, thus implying that Sikora refused to be transferred to the hospital, which could have impacted the jury's consideration of the timeline of events.

- 10 -

¶ 56                                A. Standard of Review

¶ 57     When reviewing the trial court's ruling on a motion for a new trial, we afford it considerable deference (*Wardwell v. Union Pacific R.R. Co.*, 2017 IL 120438, ¶ 11) and will only reverse the grant of a new trial only if the court has abused its discretion (*Cimino v. Sublette*, 2015 IL App (1st) 133373, ¶ 102). Similarly, questions concerning the prejudicial impact of improper comments made during closing argument, including violations of *in limine* orders, are within the purview of the trial court and may not be reversed absent an abuse of discretion. *Simmons v. Garces*, 198 Ill. 2d 541, 568 (2002); *Boren v. The BOC Group, Inc.*, 385 Ill. App. 3d 248, 257 (2008). This standard "is the most deferential standard of review" (*In re D.T.*, 212 Ill. 2d 347, 356 (2004)), and an abuse of discretion only occurs when the trial court's ruling is unreasonable, arbitrary, or fanciful, or where no reasonable person would adopt the same view (*Blum v. Koster*, 235 Ill. 2d 21, 36 (2009)). In determining whether an abuse of discretion has occurred, the question is not whether the appellate court would have made the same decision as the trial court (*State Farm Fire & Casualty Co. v. John*, 2017 IL App (2d) 170193, ¶ 18) but, rather, whether the trial court's ruling "exceeded the bounds of reason" or was "against logic" (*Vanderhoof v. Berk*, 2015 IL App (1st) 132927, ¶ 84). We afford such deference to the trial court on these issues because it "heard the comments and arguments and observed the effect of those remarks upon the jury and was in a better position to measure the prejudicial effect, if any, of defense counsel's remarks." *Carlasare v. Wilhelmi*, 134 Ill. App. 3d 1, 7 (1985).


¶ 58                               B. Golden Rule Argument

¶ 59     We begin by addressing the comment from Dr. Parikh's counsel asking the jury to place itself in Dr. Parikh's shoes on the morning in question.

¶ 60     During closing argument, attorneys have wide latitude to comment and argue based on the evidence presented at trial as well as draw any reasonable inferences from that evidence. *Clarke v. Medley Moving & Storage, Inc.*, 381 Ill. App. 3d 82, 95 (2008). However, when arguing to the jury, attorneys should not unfairly appeal to its emotions. *Chakos v. Illinois State Toll Highway Authority*, 169 Ill. App. 3d 1018, 1029 (1988). The jury must decide the case based on the evidence and issues presented at trial "unencumbered by appeals to [its] passion, prejudice or sympathy." *Lorenz v. Siano*, 248 Ill. App. 3d 946, 953 (1993). One line of argument that this court has repeatedly found to improperly elicit passion, prejudice, or sympathy from the jury is asking it to place itself in the position of either the plaintiff or the defendant. See *Koonce v. Pacilio*, 307 Ill. App. 3d 449, 457 (1999); *Chakos*, 169 Ill. App. 3d at 1029; *Copeland v. Johnson*, 63 Ill. App. 2d 361, 367 (1965) (so-called "golden rule" arguments); see also *Caudle v. D.C.*, 707 F.3d 354, 359 (D.C. Cir. 2013). Because alleged improper comments must be viewed not in isolation, but within the context of the entire closing argument (*Drews v. Gobel Freight Lines, Inc.*, 144 Ill. 2d 84, 102-03 (1991)), some golden rule arguments, while technically improper, may not elicit passion, prejudice, or sympathy from the jury. See *Offutt v. Pennoyer Merchants Transfer Co.*, 36 Ill. App. 3d 194, 204 (1976).

¶ 61     Instructive is *Offutt*, a personal injury case involving a plaintiff who fell 28 feet through an open hatchway at a printing plant. *Id.* at 196. The defendant, the contractor working at the plant that had opened the hatchway, filed a third-party action for indemnification against the plant. *Id.* During closing argument, the plant's attorney asked the jury to place itself in the position of

the plant. *Id.* at 204. Ultimately, the jury returned a verdict in favor of the plaintiff and against the contractor, and also in favor of the plant in the indemnification action with the contractor. *Id.* at 200.

¶ 62 The contractor appealed the jury's verdicts raising several arguments, including that the plant's attorney improperly asked the jury during closing argument to place itself in the plant's position. *Id.* at 204. Although the court acknowledged the general principle that it is improper to ask the jury to place itself in the position of a party, it limited that principle to only when the comment was "calculated to arouse [the jury's] passions and prejudices." *Id.* The court subsequently found that, when making the comment to the jury, the attorney "analogized [the plant's] own relationship to [the contractor] to that of a juror's relationship as a homeowner to an outside contractor working on the home." *Id.* In this manner, the attorney's comment was intended to "appeal to reason to aid the jury" in understanding the parties' various roles. *Id.* Although the attorney technically asked the jury to place itself in the position of a party, the court did "not believe that the prejudice or passions of the jury were so clearly being appealed to that a reversal would be warranted on this ground alone." *Id.* In other words, while the comment may have been technically improper, the resulting prejudice was not significant.

¶ 63 Turning to the instant case, when viewing the comment made by Dr. Parikh's counsel during closing argument in the context of the entire argument, the comment was not intended to elicit sympathy or arouse the passions of the jury, just as in *Offutt*. Rather, counsel's statement asking the jury to "[s]tand in [Dr. Parikh's] shoes on that morning" was merely intended to temporally frame the critical issues of the trial as they related to Dr. Parikh. Notably, before counsel made this statement, she urged the jury to evaluate the trial "from a prospective analysis," *i.e.*, examining the facts that Dr. Parikh knew at the time she made her differential diagnosis, instead of relying on hindsight. While technically counsel asked the jury to stand in Dr. Parikh's shoes, the comment was not overly prejudicial when its true purpose is understood. See *id.*

¶ 64 When reviewing plaintiff's motion for a new trial, the trial court noted that it was less concerned with the intent of Dr. Parikh's counsel when making the statement and more concerned with the statement's prejudicial impact. However, the intent of the statement directly affected the statement's prejudice. Only after ascertaining counsel's intent in making the statement coupled with an examination surrounding the context of that statement can the true prejudice of the statement be calculated. And here, because counsel's intent was to temporally frame the critical issues of the trial as they related to Dr. Parikh, the comment, while technically improper, did not substantially prejudice the jury. See *id.* Moreover, what prejudice did result from the argument was mitigated by the trial court's sustained objection paired with its instruction to disregard the comment. See *Wright v. Yellow Cab Co.*, 116 Ill. App. 3d 242, 258 (1983) (finding that, while the plaintiff's attorney asked the jury to place itself in the position of the plaintiff, "defendants' objection to the reference was sustained and the jury was advised to disregard the remark," thus curing the error and presenting "no ground for a new trial").

¶ 65 In sum, because of the context of the argument made by Dr. Parikh's counsel, contrary to the trial court's finding, the comment was not *clearly* improper but rather technically improper. Although in ordering a new trial, the court asserted that the cumulative effect of counsel's improper comments during closing argument warranted a new trial, the court also insinuated that counsel's improper golden rule argument individually may have warranted one. To the

extent that the court found in this manner, a new trial based on this impropriety alone is unwarranted given that no substantial prejudice resulted from the comment. See *id.*; *Offutt*, 36 Ill. App. 3d at 204.

¶ 66                                                            C. *In Limine* Order

¶ 67      We now move on to the comment from Dr. Parkih's counsel that the trial court found violated its pretrial *in limine* order. A motion *in limine* allows a party to obtain a pretrial order barring certain evidence from being presented during trial. *Kutchins v. Berg*, 264 Ill. App. 3d 926, 930 (1994). "In this way, the moving party safeguards against the prejudicial impact possibly resulting from asking questions and making objections regarding the inadmissible evidence before the jury." *Id.*

¶ 68      In this case, the trial court granted plaintiff's ninth motion *in limine*, which barred any reference to Sikora's initial refusal to be transferred to the hospital on April 9, 2013. During closing argument, Dr. Parikh's counsel attempted to summarize plaintiff's theory of the case, namely the hypothetical timeline of events had Sikora been transferred to the hospital earlier and remarked "[o]nce Mr. Sikora agreed to go to the hospital." Accompanying this statement was a projection screen with a slide that read "[o]nce [Sikora] agreed to go and did go to the hospital." While counsel did not state that Sikora initially refused to be transferred to the hospital, to which the court's *in limine* order had barred reference, counsel's statement was nevertheless implicitly barred by the court's *in limine* order. Merriam-Webster's Dictionary defines the word "once," when used as a conjunction, to mean "at the moment when" or "as soon as." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/once (last visited Aug. 23, 2018) [https://perma.cc/BJR4-Z2MH]. Thus, implicit in the statement that, once Sikora agreed to be transferred to the hospital, is that he had, at some point prior, refused to be transferred to the hospital. And therefore, the improper insinuation that Sikora had initially refused to be transferred to the hospital was put before the jury. See *Cancio v. White*, 297 Ill. App. 3d 422, 434 (1998) (finding that while an attorney did not "expressly" violate an *in limine* order, it was nevertheless "clear from the transcript that the improper insinuation was put before the jury"). Consequently, Dr. Parikh's counsel violated the trial court's *in limine* order with her statement and visual aid.

¶ 69      Despite this finding, reasonable minds could disagree over the resulting prejudice. On the one hand, the comment was merely an insinuation, not an express statement, that Sikora had, at one point, initially refused to be transferred to the hospital. And both parties agree that no violation of the *in limine* order occurred during the evidentiary portion of the trial. Additionally, when considering the brevity of the remark, it is entirely possible that the jury did not even realize that, at some point on the morning in question, Sikora initially refused to be transferred to the hospital. This is especially true because the comment was made in the context of a hypothetical timeline of events, not in a discussion of the actual facts of the case. Furthermore, the court immediately sustained plaintiff's objection to the violation of the *in limine* order, directed the visual aid to be taken down and instructed the jury to strike any mention of an agreement from their notes. See *McHale v. Kiswani Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 45 (finding that generally, "[w]here the trial court sustains a timely objection and instructs the jury to disregard the improper comment, the court sufficiently cures any prejudice").

¶ 70   On the other hand, it is possible that some members of the jury heard counsel's statement, viewed the same language on the visual aid and understood it to mean that, at one point, Sikora had refused to be transferred to the hospital. The critical theme of plaintiff's case in regard to Dr. Parikh's liability was that she did not send Sikora to the hospital for testing for a pulmonary embolism and had she done so before or around 7 a.m., his life could have been saved. Any insinuation that Sikora had control over when he was transferred to the hospital, and not Dr. Parikh, could have substantially prejudiced plaintiff's case. Although the trial court sustained plaintiff's objection, directed the visual aid to be taken down, and gave the jury a curative instruction, there are instances where an improper comment "can be so overwhelmingly prejudicial despite an objection and the trial court's sustaining of that objection." *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 856-57 (2010); see *Rutledge v. St. Anne's Hospital*, 230 Ill. App. 3d 786, 794-95 (1992) (holding the plaintiff was denied a fair trial despite the trial court sustaining his objections and admonishing the jury to disregard the comments made by defense counsel).

¶ 71   In sum, there was a violation of the trial court's *in limine* order. While reasonable minds could disagree over the resulting prejudice from the comment and visual aid, the trial court was in the best position to measure the prejudicial effect on the jury and whether that prejudice was ameliorated by the objection and curative instruction. See *Carlasare*, 134 Ill. App. 3d at 7. The court found the remark to be highly prejudicial, and given its position of being present at the moment the error occurred compared to our position of reviewing a cold record, we have no basis to reject its finding that the violation of the *in limine* order was highly prejudicial.

¶ 72                                  D. Cumulative Error

¶ 73   Although Dr. Parikh's counsel technically made two improper remarks during closing argument, reversal is not automatic, as litigants are only assured a fair trial, not "a perfect trial." *Department of Transportation v. Dalzell*, 2018 IL App (2d) 160911, ¶ 127. But when errors cumulatively are "so prejudicial" to the outcome of a trial, a new trial is the proper remedy. *Id.* In other words, where the errors together deprive a party of a fair trial such "that the verdict might have been affected," a new trial is warranted. *In re Estate of Mankowski*, 2014 IL App (2d) 140154, ¶ 63. When analyzing the effect of cumulative errors, we look not only at the instances where the errors occurred but also the trial in its entirety. *Doe v. Bridgeforth*, 2018 IL App (1st) 170182, ¶ 63.

¶ 74   Viewing the trial as a whole, we cannot say that the trial court's decision to grant a new trial was so unreasonable, arbitrary, or fanciful such that no reasonable person would adopt the same view. We understand this trial consisted of eight days of testimony and closing arguments replete with several testifying experts where the facts concerning the condition of Sikora on the morning of April 9, 2013, were largely undisputed from Dr. Parikh's perspective. Additionally, Dr. Parikh readily admitted at trial that she believed Sikora was suffering from a recurrence of pneumonia rather than a pulmonary embolism based on what she knew. As such, the alleged negligence of Dr. Parikh largely boiled down to whether the jury believed plaintiff's experts who generally believed that Dr. Parikh breached her standard of care by not realizing Sikora was suffering from a pulmonary embolism and immediately sending him to the hospital for testing consistent with that diagnosis or believed Dr. Parikh's experts who believed that she met her standard of care when she determined that Sikora was most likely suffering from a recurrence of pneumonia and ordered tests consistent with that diagnosis. The

- 14 -

jury also had to resolve additional issues concerning proximate causation, such as whether a CT pulmonary angiogram would have been performed on Sikora had he been transferred to the hospital earlier and whether the pulmonary embolism would have been seen on the image, and even further, whether the treatment options would have been successful in stopping the pulmonary embolism. These issues similarly depended greatly on which experts the jury believed.

¶ 75     But as discussed, the violation of the trial court's *in limine* order by Dr. Parikh's counsel could have left the impression on some members of the jury that Sikora, not Dr. Parikh, had ultimate control over when he was transferred to the hospital, which could have substantially prejudiced plaintiff's case. Although the trial court used this reasoning when it found the comment and visual aid highly prejudicial, it did not give any indication if, and how, the jury reacted to the comment and visual aid. Yet, the fact that the court instructed members of the jury to strike any mention of an agreement from their notes lends credence to the possibility that some members of the jury had written something in their notes based upon the comment and visual aid. Importantly, regardless of whether the trial court's instruction to strike any mention of an agreement from its notes shows the comment and visual aid impacted the jury, we have no ability to see if, and how, the jury reacted. Some may have reacted with surprise. Some may have acted with confusion. Others might have remained stoic. We have no idea. Because so much is revealed by the reactions, facial expressions, and general demeanor of the jury, the trial court, not this court, was in the best position to know if, and how, the jury reacted to the comment and visual aid and to what degree the jury was prejudiced. See *Carlasare*, 134 Ill. App. 3d at 7.

¶ 76     Despite our finding that the trial court ascribed too much prejudice to the technically improper golden rule argument, we have no basis to reject its finding that the violation of the *in limine* order was highly prejudicial, and therefore, we cannot find that the court's overall decision to grant a new trial exceeded the bounds of reason or was illogical. See *Vanderhoof*, 2015 IL App (1st) 132927, ¶ 84. Based on the record, any attempt to do so would merely be this court substituting in our judgment for that of the trial court in a *de novo* fashion and ignoring the deference we must afford to it. See *State Farm*, 2017 IL App (2d) 170193, ¶ 18. Accordingly, the trial court did not abuse its discretion in ordering a new trial.

¶ 77                                III. CONCLUSION

¶ 78     For the foregoing reasons, we affirm the order of the circuit court of Cook County, which granted plaintiff's motion for a new trial.

¶ 79     Affirmed.

¶ 80     JUSTICE GORDON, specially concurring:

¶ 81     I agree with the majority decision to affirm the order of the circuit court of Cook County, which granted plaintiff's motion for a new trial, but I must write separately concerning the majority's analysis of defense counsel's closing argument asking the jury to place itself in Dr. Parikh's shoes on the morning that the decedent was transported to the hospital. The majority states that the argument "was not intended to elicit sympathy or arouse the passions of the jury" but "was merely intended to temporally frame the critical issues of the trial as they related to Dr. Parikh." *Supra* ¶ 63. I cannot understand how the majority can look into the subjective

- 15 -

manifestations of defense counsel and come to that conclusion. The only person in the courtroom who knew defense counsel's intentions was defense counsel. An appellate court reading a cold record could never make such a determination, and no such determination should have been made in the case at bar. In a medical malpractice case, it is never appropriate and it is always error when a lawyer asks the jury to place themselves in the shoes of the physician because the jury does not have the medical training and experience that would be necessary to understand the decision-making process of the physician in complying with the required standard of care. Whether that error is reversible error is a question that we need not solve in this case.

¶ 82    From the cold record of this case, it would appear that the trial strategy of the defense was to present evidence that the decedent had initially refused to be transported to the hospital. Prior to trial, the trial court granted plaintiff's motion *in limine* barring the defense from bringing this information before the jury, finding that it was irrelevant. The barring order frustrated the defense from telling its complete story and planned defense, which they had already prepared. Notwithstanding the trial court's granting of the motion *in limine*, the defense, in its closing argument, initially asked the jury to place itself in the physician's shoes. If that was the only comment in closing concerning the matter, our job would be to determine whether that statement elicited empathy for the physician or aroused the passions of the jury to the point where plaintiff could not have received a fair trial. However, we do not have to consider that one comment in isolation here because defense counsel compounded the problem with another remark when she stated: "[o]nce Mr. Sikora agreed to go to the hospital" and these words were placed on a projection screen, which the majority agrees was "implicitly barred by the court's *in limine* order." *Supra* ¶ 68. In a *preprepared* slide, defendant flashed that refusal in front of the jury's eyes during closing, so that they could not possible miss it. Defendant flashed on *a projection screen* a slide that read: "*Once he agreed to go* and did go to the hospital, he would have had a CT scan ***."[3] (Emphasis added.) This was a slide that defendant had prepared, in advance of closing, for the purpose of discussing plaintiff's theory of the case with the jury.

¶ 83    The phrase "[o]nce he agreed to go and did go" leaves no doubt that there was an earlier time, prior to his agreeing, when plaintiff refused to go. No instruction to disregard the statement could cure it, as the trial court found, because the jurors had no idea for how long he had refused.

¶ 84    The problem with the slide was compounded by the fact that defendant verbally stated: "Once [the deceased] agreed to go to the hospital." Between the oral statement and the reinforcing visual aide, there was no way that the jury could have missed the import of the word "[o]nce." The first definition for "once" as a conjunction is "as soon as." Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/once (last visited Aug. 2, 2018) [https://perma.cc/XP4V-464C]. Thus, the jurors heard—and viewed—the defense state that, "as soon as" the deceased agreed to go to the hospital, he was transported there. Since an important theme of plaintiff's case was that defendant had not acted quickly enough, a

---

[3]During the hearing on plaintiff's posttrial motion for a new trial, the trial court found, as a matter of fact: "Counsel placed a medical record on a display screen which stated to the effect that Plaintiff hadn't agreed to go to the hospital."

statement that the timing was actually in the deceased's control—and not defendant's—was too damaging for plaintiff to recover from.

¶ 85 The problem with the verbal and visual "once" statements was further compounded by defendant's plea for empathy, asking the jurors to "[s]tand in her shoes on that morning." In essence, the jurors were being asked to stand in the doctor's shoes, when faced with a patient who was refusing to go to the hospital.[4]

¶ 86 Defense counsel made two improper remarks during closing argument and the cumulative effect of these improper remarks prejudiced plaintiff to such a degree that it affected the verdict. The trial court was the only judge that observed the jury and observed the impact of these improper comments.

¶ 87 The trial judge, having heard all these statements firsthand, found that there was no choice but to grant a new trial. Specifically, the trial judge found:

"Both parties were extremely concerned with the timeline of events and possible delays in treatment at trial ***. Indeed, the timeline and possible delays was a central theme of this case. To submit evidence that Plaintiff may have control over when he goes to the hospital and thereby caused a delay in his treatment was, to say the least, highly prejudicial. Such evidence could only severely damage Plaintiff's case."

¶ 88 I conclude that it was both comments taken together that had a combined affect to deprive plaintiff of a fair trial.

---

[4]It is generally improper for counsel during closing to ask "the jury to place itself in the shoes" of a victim or party, thereby inviting the jury " 'to enter into some sort of empathetic identification with' " him or her. *People v. Wood*, 341 Ill. App. 3d 599, 614 (2003) (quoting *People v. Spreitzer*, 123 Ill. 2d 1, 38 (1988)).