2024 IL App (1st) 231244-U

SIXTH DIVISION
November 1, 2024

No. 1-23-1244

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| ROBERTO CUEVAS and MONIKA RAMOS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellees, | ) | Cook County |
| | ) | |
| v. | ) | No. 20 L 10431 |
| | ) | |
| ADOLFO BARRON-ESPARZA, | ) | The Honorable |
| | ) | James Varga, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE TAILOR delivered the judgment of the court.
Justices C.A. Walker and Gamrath concur in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the trial court's decision to deny defendant's motion for a new trial, but remand for the trial court to enter a judgment for damages consistent with the jury's verdict.

¶ 2                                    I. BACKGROUND

¶ 3    On the afternoon of August 28, 2019, Roberto Cuevas, his fiancé, Monika Ramos, and their newborn son, Aiden, were in a car accident with Adolfo Barron-Esparza at the intersection of Liberty Street and Cooper Avenue in Elgin, Illinois. Cuevas and Ramos (collectively, Plaintiffs) filed a complaint against Barron-Esparza, alleging that as they were driving northbound on Liberty

Street and Barron-Esparza was driving westbound on Cooper Avenue, Barron-Esparza failed to yield at a stop sign, proceeded into the intersection of Cooper and Liberty, and caused their vehicles to collide. Plaintiffs claimed they were injured as a result. Barron-Esparza filed a counterclaim, alleging that Cuevas, the driver, was contributorily negligent and therefore Barron-Esparza was "entitled to contribution" from Cuevas for any alleged injuries sustained by Ramos. Barron-Esparza asked that judgment "be entered in favor of [him] and against [Cuevas] for Contribution in whole or in part for the negligence attributable to [Cuevas]."

¶ 4     Before trial, Barron-Esparza filed several motions *in limine*. He asked the court to bar (1) any testimony or inference that he had liability insurance at the time of the accident; (2) any testimony, remark, statement or inference that he received a traffic citation as a result of the occurrence; (3) any lay person medical testimony; and (4) any testimony, remark or inference regarding the permanency of Plaintiffs' injuries. The court granted all four motions.

¶ 5     Plaintiffs moved to present evidence of the emotional distress they suffered because their newborn was in the car with them at the time of the accident, but the court denied their motion. Plaintiffs also wanted to use a PowerPoint presentation, which included a number of photos of their newborn baby and their time in the hospital with him. The court sustained Barron-Esparza's objection and the photos were barred.

¶ 6     A jury trial was held February 14-17 and February 21 and 22, 2023. A transcript of the entire jury trial is not in the record. Instead, the record contains a bystander's report, which summarizes the jury trial, as well as transcripts of certain portions of the proceedings.

¶ 7     In his opening statement, Plaintiffs' counsel stated that the accident occurred as Plaintiffs were driving home from a follow-up appointment with their doctor shortly after the birth of their child, where Ramos had 33 cesarean section staples removed. Defense counsel objected to

counsel's references to Ramos's birth experience and post-partum treatment on relevance grounds, and the court sustained the objection.

¶ 8    Investigating police officer Nathan Linden testified that Liberty Street is a one-way road going north with no traffic controls, and that Cooper Avenue is a two-way road going east-west that intersects with Liberty. There are stop signs in both the east and west directions of Cooper where it intersects with Liberty. When Linden arrived on scene on August 28, 2019, he observed two vehicles in the middle of the intersection of Liberty and Cooper. One was an Astro van that was driven by Barron-Esparza; the other was a Nissan sedan that was driven by Cuevas. Ramos and Plaintiffs' infant son were also in the Nissan. When Linden was asked by Plaintiffs' counsel what his "observations of the crash" were, Linden said the Astro van had the stop sign and the duty to yield to the Nissan. When asked about the location of the impact, Linden said the impact was to the front of the Nissan and to the side of the Astro van. He said it was a "heavy crash" that disabled both vehicles, requiring a tow. Linden observed an injury to Cuevas' right arm, but he refused emergency medical treatment at the scene. Ramos "appeared distressed and concerned for the baby" but she reported no injuries to her or the baby.

¶ 9    Dr. Henry Kurzydlowski testified next. He treats patients with pain and is board certified in pain management. He treated Plaintiffs after the accident and testified about his diagnosis, treatment and prognosis. He saw Cuevas for the first time on December 15, 2019, where Cuevas reported that he had been in a car crash with his family and that afterwards, he suffered from low back pain that radiated into his right leg, neck, left shoulder and arm, and that he walked with an abnormal gait due to his lower back pain. Cuevas reported no neck, back, leg, or shoulder issues prior to the accident. Dr. Kurzydlowski diagnosed Cuevas with a low back injury, cervicalgia, and pain in his left shoulder with trigger points in his neck, left shoulder and lumbar region. He said

that Cuevas' symptoms were consistent with the type of trauma a person would suffer in this type of crash and that he believed, based on a reasonable degree of medical certainty, that Cuevas's injuries were caused by the crash.

¶ 10    Dr. Kurzydlowski ordered a magnetic resonance imaging (MRI) study for Cuevas after his first visit because his symptoms were not improving. Cuevas saw Dr. Kurzydlowski again on January 9, 2020, complaining of the same symptoms and pain. The MRI report, which was admitted into evidence, showed there was some degeneration on the bottom disc of Cuevas' lower back. Dr. Kurzydlowski said that while disc degeneration is a common condition that can have no symptoms, it is "common" for a car crash to aggravate the condition to the point that it can cause pain. Dr. Kurzydlowski said the MRI also showed evidence of a protruding disc that was "more likely than not" caused by the car accident. He said healing from this type of injury can take six months to two years, and that if Cuevas was still suffering pain afterwards, he should be reevaluated to consider a steroid injection or surgery. Cuevas returned to Dr. Kurzydlowski again on February 4, 2021, complaining of the same pain.

¶ 11    On cross examination, Dr. Kurzydlowski stated that his findings were based on Cuevas's subjective complaints of pain as well as the objective tests he performed, including range of motion testing, his observations of Cuevas's gait, his palpitation to Cuevas's shoulder, his observation of muscle spasms, and the MRI's objective findings. He opined that Cuevas's injuries were more likely than not caused by the crash, and that given Cuevas's MRI results and complaints of pain that had been ongoing for nearly 4 years, his injuries were likely to cause him pain "indefinitely." Stating, "once a bad back, always a bad back," Dr. Kurzydlowski opined that Cuevas would continue to suffer and require additional care and that his injuries would affect his ability to pick

things up, carry things over 10 pounds, play basketball, sit, sleep, drive, run, carry his child, and work out.

¶ 12    Dr. Kurzydlowski treated Ramos as well. He saw her for the first time on December 5, 2019, when she complained of thoracic and lower back pain that started after the crash. Based on his physical exam, he noticed that Ramos walked a little crooked and opined that this was due to the crash. Ramos rated her pain as a 7 out of 10, said her pain was exacerbated by motion and activity, and said she could not take pain medication at the time because she was breastfeeding. Dr. Kurzydlowski ordered an MRI for her as well, which showed disc protrusion. Dr. Kurzydlowski opined that this was more likely than not caused by the crash. Ramos returned to see Dr. Kurzydlowski again on January 9, 2020, due to ongoing pain. Dr. Kurzydlowski prescribed physical therapy, both on an out-patient basis and at home. When he saw Ramos again on February 4, 2021, she continued to complain about the same symptoms. Dr. Kurzydlowski opined that Ramos's injuries would continue to cause her pain and discomfort when bending, carrying things, and holding her baby for extended periods of time. He said her injuries would not likely go away, and that if she had flare ups in the future, she could start thinking about steroid injections. Dr. Kurzydlowski testified that Ramos's subjective complaints of pain were corroborated by his objective findings, such as the MRI report, the physical exams he performed, and the limitations on Ramos's range of motion he observed. On cross examination, he admitted that he could not date the onset of findings on the MRI for either Cuevas or Ramos and admitted that there are lots of causes for annular tears, which are cracks or tears in the thick outer layers of vertebral discs. Dr. Kurzydlowski said trauma like a car crash can cause disc dessication in the spine to become symptomatic and that a traumatic car crash could cause herniated discs and annular tears.

¶ 13    Cuevas testified that before August 2019, he never had any neck, back, leg, shoulder, or forearm injuries. On August 28, 2019, he was driving home from the hospital following a doctor's appointment. Ramos was sitting behind him, and his son Aiden was in the middle back seat. It was a clear, sunny day. As he was driving north on Liberty Street, he was "mindful of his precious cargo and driving very safe." He was in the middle lane of the three-lane street, and there was a large bus in the lane to his right. As he approached the intersection with Cooper Avenue, he saw a van approaching the stop sign on Cooper and expected it to stop and yield. Cuevas was driving about 20-25 miles per hour and had no traffic controls or stop sign. He saw the van by the stop sign and then saw the van suddenly cross onto Liberty. He tried to slam on his brakes to avoid a collision but he didn't have time. Cuevas described the impact as "heavy" and said he felt like he "hit a brick wall." His airbags deployed and the emblem on the car's steering wheel dug into his arm and caused a laceration. He was in shock after the crash and felt pain, but was more concerned for the welfare of his child and his fiancé Ramos. Plaintiffs' counsel asked him if he was found at fault for the accident, but before he could respond, defense counsel objected. The court sustained the objection and gave a curative instruction to the jury. The court then denied defense counsel's motion for a mistrial based on counsel's question.

¶ 14    Cuevas testified that he had pain in his neck, back, legs, and shoulder after the accident as well as a scar on his left forearm that remained visible for years and looked like the Nissan emblem from the steering wheel. As a result of his injuries, Cuevas said that he could not carry his baby without pain, that his forearm scar caused him embarrassment, and that he no longer went to the gym to work out or play basketball because it pains him and tires him out for the rest of the day.

¶ 15    Cuevas first went to the hospital on September 13, 2019, where he was seen by a primary care doctor, Dr. Aziz. He then went to the Illinois Orthopedic Network, where he was seen by Dr.

Lipov, a pain management specialist on September 27, 2019, December 5, 2019, and January 9, 2020. He rated his pain as a 7 out of 10. The doctors prescribed muscle relaxers and anti-inflammatory medications. He began seeing Dr. Kurzydlowski on December 5, 2019. Dr. Kurzydlowski recommended steroid injections for his pain but Cuevas chose not to get them because he was afraid of needles and wanted to reduce medical bills and try conservative treatment given his age. He went to West Suburban Physical Therapy for eight physical therapy sessions and continued to do therapy at home. Therapy helped to reduce the pain but did not get rid of it.

¶ 16    Cuevas admitted on cross examination that he suffered a work accident prior to the crash where he fractured his ankle, but said he had no preexisting conditions at all before the crash. Cuevas also admitted on cross that he is still able to play basketball with friends but that he does not do so because it is not fair for him to come back home in pain and exhausted. Defense counsel then asked Cuevas about the "rough six days" before the crash, referring to Ramos's difficult labor with their son and the six "rough days" after the baby was born. Cuevas testified that Ramos went into labor on August 20, 2019, but needed an emergency C section after she began to hemorrhage. His son was born on August 22, 2019, and needed to stay in the hospital for two more days due to jaundice. After the family was discharged on August 26, 2019, they rested with the baby at home. When defense counsel asked Cuevas if he was "driving tired" after the rough six days, he said no. He denied driving tired and denied that he was negligent.

¶ 17    Adolfo Barron-Esparza testified as an adverse witness. He said that he was driving a white Astro van on August 28, 2019, traveling west on Cooper Avenue. He stopped at the stop sign before Liberty Street, saw a bus traveling north, and waited for the bus to pass so he could proceed. The bus did not proceed through the intersection but made a right turn onto Cooper. After the bus made its turn, Barron-Esparza entered the intersection of Cooper and Liberty and felt the impact

of the crash. He never saw Plaintiffs until after the impact. When Plaintiffs' counsel asked him if he looked to his left to make sure the intersection was clear before he entered, Barron-Esparza responded that he "never saw the plaintiffs until after impact." He said the "hard" impact occurred in the middle lane. The damage was to the front of Plaintiffs' vehicle and to the left side of his vehicle. His door would not open after the impact and his van was not drivable.

¶ 18    Monika Ramos testified that on August 28, 2019, she was 23 years old. When plaintiffs' counsel asked her about the "six days that occurred leading up to this crash," defense counsel objected and the court sustained the objection. Ramos testified that she had her first follow-up appointment with her doctor, after giving birth to her son, on August 28, 2019, where she had her C-section staples removed. When plaintiff's counsel asked if the doctor "removed 33 staples" defense counsel objected and the court sustained the objection. Ramos explained that on her way home from her doctor's visit, Cuevas was driving, she was seated behind him, and their son was in the middle back seat. They took Liberty Street home, a three-lane one-way street that goes north. Liberty Street has no traffic signs or controls where it intersects with Cooper Avenue, and Cooper has stop signs in both directions where it intersects with Liberty. She and Cuevas were traveling north and there was a bus in the lane to their right. They were going "25, maybe 30 miles per hour" and they were not speeding. The bus next to them was traveling probably 30 or 35 miles per hour. Cuevas was not tired because he "had just rested" for two days at home. As they were approaching Coooper, she saw the bus next to them take off a little faster than they did, and then she looked up and saw a van "crossing right in front of [them]." Although Cuevas was trying to "stop the car, to prevent this from happening", they collided with the van. There was a loud impact, and it was "really scary." Afterwards, Ramos "made sure everybody was okay." She was in shock and the baby was crying. Cuevas went over to the other driver, and witnesses on the street asked if they

8

were okay. Police arrived on scene several minutes later. Paramedics also arrived and examined Ramos and her son. She was still in pain from her C-section but was "really just focused on [her] child." She observed that Cuevas had "the Nissan print on his arm" and that he kept holding his arm.

¶ 19    Ramos testified she suffered injuries to her lower back, mid back, and neck. These injuries affected her ability to breastfeed, pick up her son, take groceries upstairs, and to do other things like that. The pain affected her sleep and regular activities and stopped her from playing sports with her family. She sought treatment for the first time on September 29, 2019, at the Illinois Orthopedic Network. She did not go before then because she and Cuevas did not have a car or babysitter after the accident. Until that first visit at Illinois Orthopedic Network, she used heating pads and ice packs and did some stretching to help alleviate the pain. She was referred to physical therapy after her visit to the Illinois Orthopedic Network, and participated in eight physical therapy sessions at West Suburban Physical Therapy to treat her neck and back pain. She went to see Dr. Kurzydlowski on December 5, 2019, January 9, 2020, and February 4, 2021. She rated her pain on these visits from a 7 to a 9 out of 10. She had two MRIs and Dr. Kurzydlowski recommended that she take pain medicine and get a steroid injection, but she could not do either because she was breastfeeding. She stopped seeing him in February 2021 because of COVID, but continued doing exercises at home. She said she still suffers from back pain, and that Cuevas still complains about back pain when he wakes up. She was in a previous car crash in 2016 where she suffered an injury to her kidney and spleen, but those injuries were completely healed six months after the crash. She had never suffered any spinal injuries before the car accident on August 28, 2019.

¶ 20    When discussing the verdict form for Ramos at the jury instruction conference with the court, defense counsel stated, "we just agree to enter a verdict in proportion to the negligence. Say

[the jury] give[s] her a hundred dollars ***and [the jury finds Cuevas and Barron-Esparza] 50/50 [liable]. We'll enter a verdict consistent with that. We'll enter a verdict against [Cuevas] *** for the 50 percent on the contrib[utory negligence] case. **** I thought that's how we decided we were going to handle my contrib[utory negligence] case, instead of giving the 600 series [of Illinois Pattern Jury Instructions on the apportionment of responsibility and contribution], which would *** blow everybody's mind." She continued, "the verdict forms that [Plaintiffs' counsel] submitted do apportion fault, and then your Honor can enter judgment based on the apportionment of negligence, rather than give the whole *** 600 series." Defense counsel noted that the "verdict form doesn't reduce, but I think the *** idea was, Judge, because we're apportioning the damages in the verdict form for [Ramos], the Court will just enter a judgment consistent with the apportionment of damage, rather than give the whole 600 series." The court proposed a hypothetical where the jury found Barron-Esparza 60% liable and Cuevas 40% liable and asked, "what does that do to [Ramos's] money?" Defense counsel stated, "you enter 60 percent against my client, and 40 percent against [Cuevas]. *** [H]er damages don't get reduced based upon [Cuevas's] negligence. It's just who they are against, right? It's just who her damages would be against." The court responded, "I can do that." It added, "I have this post-judgment agreement. So we use [Plaintiffs' counsel's] original Verdict form, right?" The parties agreed and defense counsel confirmed that "the judge will enter a verdict in accordance with the jury's apportionment of liability negligence, attributable to defendant and *** Cuevas, and the Court will enter a verdict post-judgment against each of those drivers." The court clarified that this related to "[t]he percentage of the damages" and said, "Okay. I can go along with that." Again, defense counsel said that the parties "decided to do that ***instead of giving the jury the contributory 600 series."

10

¶ 21    During closing argument, Plaintiffs' counsel used a PowerPoint presentation. Defense counsel objected to a slide that read, "causing this crash and the chaos that followed." The court sustained the objection and instructed Plaintiffs' counsel to take down the slide. Outside the presence of the jury, defense counsel objected to other specific slides as well as the entire PowerPoint presentation, arguing that it was "misleading" and "prejudicial." After Plaintiffs' counsel agreed not to show several of the objectionable slides, defense counsel continued to object, arguing that "the way [he was] using the PowerPoint presentation has been prejudicial to the defendant." The court disagreed, stating that "if [the slides] reflect[] the facts in the case, he can use it. That's the law." As the parties continued to argue over which slides Plaintiffs' counsel could display, Plaintiffs' counsel said he was "willing to go through the [PowerPoint] with [defense] counsel and remove whatever she has a problem with." Ultimately, the court decided to limit Plaintiffs' counsel to the slides that had already been shown to the jury during trial.

¶ 22    At the end of Plaintiffs' counsel's closing argument, he told the jury it "should not consider how the verdict is going to get paid." Defense counsel objected to this comment, and the court sustained the objection. Defense counsel then moved for a mistrial based on Plaintiffs' counsel's comment. She argued that this was a reference to insurance, which the court ruled inadmissible before trial. She argued that a mistrial was also warranted because of Plaintiffs' counsel's "continued failure to follow the rules of the Court." The court denied the motion, noting that it sustained defense counsel's objection to plaintiffs' counsel's objectionable remarks and to any improper slides and that the jury had been instructed that it could not consider these in its deliberations.

¶ 23    After closing arguments were complete, the court instructed the jury that its "verdict must not be based on speculation, prejudice, or sympathy" and that "[i]f any statement or argument of

an attorney is not supported by the law or the evidence, [it] should disregard that statement or argument." It also instructed the jury that "[w]hether a party is insured or not insured has no bearing on any issue that [it] must decide" and that it "must refrain from any inference, speculation, discussion about insurance."

¶ 24 The jury found in favor of Cuevas and against Barron-Esparza. It assessed damages in favor Cuevas in the amount of $80,000 but reduced the award to $64,000 because it found that he bore 20% of the legal responsibility for the accident. The court entered judgment in favor of Cuevas and against Barron-Esparza for $64,000. The jury also found in favor of Ramos and against Barron-Esparza, and assessed damages in the amount of $80,000. Although the jury found the "percentage of legal responsibility attributable to" Barron-Esparza for Ramos's injuries was 80%, and that Cuevas was 20% responsible, the court entered judgment in favor of Ramos and against Barron-Esparza for $80,000.

¶ 25 On March 17, 2023, Barron-Esparza filed a motion for a new trial or, alternatively, for remittitur and other relief. He argued that "the verdict does not represent a fair evaluation of compensatory damages because it was entered following 'extensive misconduct' by plaintiffs' counsel that was so egregious that it deprived [Barron-Esparza] of a fair trial and substantially impaired the integrity of the judicial process itself." He also asked that the "amounts awarded by the jury for medical bills be consistent with the evidence presented at trial" and further requested that the court "modify the judgment and apportion the judgment in favor [of] Plaintiff Monika Ramos consistent with the agreement of counsel and the instructions given." Barron-Esparza noted that the parties "had agreed to instruct the jury to apportion negligence between [Cuevas] and [Barron-Esparza] in lieu of giving the 600 series contribution jury instructions and that, on Monika Ramos's claim, judgment would be entered against Cuevas and Barron-Esparza according to the

apportionment of negligence." He stated that "the Judgment entered in favor of Monika Ramos should be modified 80% against Barron-Esparza ($64,000) and 20% against Cuevas (($16,000))."

¶ 26    In Plaintiffs' response, they argued that a new trial was not warranted based on any alleged misconduct, and that nothing Plaintiffs' counsel did or said deprived Barron-Esparza of a fair trial. Plaintiffs argued that no remittitur should be issued for Ramos because there was no excessive award based on the medical bills admitted into evidence, but acknowledged that the damages award in favor of Cuevas based on his medical bills should be remitted by $764. Plaintiffs also conceded that because Barron-Esparza was successful on his third-party complaint against Cuevas, a judgment order could be entered for Barron-Esparza on the third-party complaint that amounts to 20% of Ramos's verdict. Defense counsel responded that instead of entering an order requiring Cuevas to pay Barron-Esparza in contribution, the court should "enter a verdict post-judgment against Cuevas and Barron-Esparza according to the apportionment of negligence."

¶ 27    On June 14, 2023, a hearing was held on Barron-Esparza's post-trial motion. The record does not contain a transcript or bystander's report of the hearing, however. The court's order indicates that Barron-Esparza's motion for a new trial was denied and that a "memorandum order" would follow. The court's June 21, 2023, order stated that Barron-Esparza's post-trial motion was denied, and that "[a]ny prejudice resulting from plaintiffs' counsel's conduct did not rise to a level that denied a fair trial to the defendant." The court noted that it "sustained the defendant's objections and admonished plaintiffs' counsel outside the presence of the jury" and that "Plaintiffs' counsel did not exhibit any intentionally abusive or unethical conduct." The court went on to find that "the jury returned reasonable verdicts. The parties introduced evidence of an intersection collision between the parties' two vehicles with a stop sign for the defendant. The jurors found Roberto Cuevas, the driving plaintiff, twenty-percent at fault. Neither the total amount of damages

13

nor the itemized amounts awarded for both plaintiffs are excessive." It also granted prejudgment interest to Plaintiffs.

¶ 28 Barron-Esparza timely appealed.

¶ 29                              II. ANALYSIS

¶ 30                              A. Attorney Misconduct

¶ 31 We review a trial court's order denying a motion for a new trial based upon attorney misconduct for an abuse of discretion. *Lee v Calfa*, 174 Ill. App. 3d 101, 113 (1988). "[A] trial court's decision [on whether] to grant a new trial on [the basis of attorney misconduct] is to be accorded great deference, and will not be disturbed on appeal absent a clear abuse of discretion. This is because the attitude and demeanor of counsel, as well as the atmosphere of the courtroom, cannot be reproduced in the record, and the trial court is in a superior position to assess and determine the effect of improper conduct on the part of counsel." *Bisset v. Village of Lemont*, 119 Ill. App. 3d 863, 865 (1983) (internal citation omitted).

¶ 32 Barron-Esparza argues that Plaintiffs' counsel repeatedly violated the court's *in limine* rulings. First, even though the court barred Plaintiffs from making any reference to insurance, Plaintiffs' counsel alluded to the fact that Barron-Esparza had insurance by stating during closing argument, "You should not consider how the verdict is going to get paid." While "evidence which informs the jury that the defendant in a personal injury action is insured against liability is [generally] inadmissible on grounds of relevancy" (*Imparato v. Rooney*, 95 Ill. App. 3d 11, 15 (1981)), "[t]he mere mention of insurance or lack thereof does not automatically require reversal and remand for new trial." *Koonce ex rel. Koonce v. Pacilio*, 307 Ill. App. 3d 449, 456 (1999). Instead, a showing of prejudice is required. *Lenz v Julian*, 276 Il. App. 3d 66, 75 (1995). Here, Plaintiffs' counsel never stated that Barron-Esparza was insured or even mentioned the word

insurance. However, because his comment could be construed as a reference to insurance, the court sustained defense counsel's objection, and immediately after counsel's statement at the end of his closing, the court proceeded to instruct the jury, including that "[w]hether a party is insured or not insured has no bearing on any issue that [it] must decide" and that it "must refrain from any inference, speculation, discussion about insurance." Thus, any possible prejudice was cured. See *People v. Moore*, 171 Ill. 2d 74, 105-06 (1996) ("[t]he act of sustaining an objection and properly admonishing the jury is usually viewed as sufficient to cure any prejudice."); *McHale v. W.D. Trucking, Inc.,* 2015 IL App (1st) 132625, ¶ 45 (same). Because we "presume[] that jurors follow the instructions provided by the trial court" (*People v. Green,* 2017 IL App (1st) 152513, ¶ 98), we find any error tied to this statement harmless.

¶ 33    Second, Barron-Esparza argues that Plaintiffs' counsel violated the court's *in limine* ruling disallowing "remark[s], statement[s] or inference[s] that [Barron-Esparza] received a traffic citation as a result of the occurrence" when he asked Cuevas if he "received a traffic citation as a result of the occurrence" and by asking him if the investigating police officer told him who was "at fault" for the accident. However, defense counsel objected to both questions, the court sustained both objections, and Cuevas was not allowed to answer, so the jury heard no testimony about traffic citations or the officer's beliefs about who was at fault for the accident. Therefore, Barron-Esparza has not shown any prejudice.

¶ 34    Third, Barron-Esparza argues that Plaintiffs' counsel improperly elicited lay person medical testimony from Ramos about her injuries. Again, however, defense counsel's objections to these questions were sustained, so no lay person medical testimony was admitted. Moreover, Barron-Esparza cannot show that he was prejudiced because Ramos's treating physician, Dr.

15

Kurzydlowski, testified about Ramos's injuries, diagnosis, and treatment, and the medical records that were admitted into evidence supported his findings. .

¶ 35    Next, Barron-Esparza argues that Plaintiffs' counsel committed misconduct by "ma[king] a continuous effort to introduce irrelevant evidence at trial," both through PowerPoint slides regarding the birth of Plaintiffs' son and by suggesting emotional distress because Plaintiffs' son was in the car with them at the time of the accident. However, Barron-Esparza's objections to the "irrelevant" PowerPoint slides related to the birth of Plaintiffs' son were sustained before trial so those slides were never shown to the jury, and the trial court did not allow Plaintiffs to pursue a claim for emotional distress. Because the slides and the emotional distress claim were never before the jury, Barron-Esparza suffered no prejudice.

¶ 36    Barron-Esparza also argues that Plaintiffs' counsel improperly attempted to "create sympathy for a young family" by eliciting irrelevant testimony about the birth of Plaintiffs' son when he asked Ramos to tell him "about the roughly six days that occurred leading up to this crash[.]" However, defense counsel's objection to this question, as well as to others regarding Ramos's post-partum care, were sustained before Ramos could answer, so the jury heard no testimony from Ramos about the days leading up to crash other than her testimony that she had her C-section staples removed and that her son had a follow-up doctor's appointment. Moreover, the jury had already heard similar testimony from Cuevas that was elicited by defense counsel during cross examination. It was defense counsel who questioned Cuevas about the "rough six days" leading up to the crash, and elicited testimony from him about the birth of his newborn son, about Ramos's "emergency C-section" after she "began to hemorrhage," and about his son's extended hospital stay due to jaundice, all in an effort to convince the jury that Cuevas was "driving tired" on the date of the accident. By asking these questions of Cuevas, defense counsel opened

16

the door to similar questions being asked of Ramos. See *People v. Jefferson*, 184 Ill. 2d 486, 497 (1998) ("evidence that is inadmissible may become admissible if the defense opens the door to its introduction"). Moreover, because any testimony from Ramos about the days leading up to the crash was invited by defense counsel and cumulative of the testimony defense counsel had already elicited from Cuevas, Barron-Esparza cannot now complain he was somehow prejudiced by it. *Snowstar Corporation v. A&A Air Conditioning & Refrigeration Service, Inc.,* 2024 IL App (4th) 230757, ¶ 107 (a "party who 'opens the door' on a particular subject is barred from objecting to questioning based upon the same subject," so he "cannot complain [on appeal] about a line of inquiry that he has invited") (internal quotations and citations omitted).

¶ 37     Next, Barron-Esparza contends that Plaintiffs' counsel improperly made "numerous pleas for an award of permanency" even though the court had disallowed a permanency claim. Barron-Esparza points to counsel's comments in closing that, "This is as good as it's going to get for [Cuevas] and [Ramos]," that "[h]uman beings can't install a new spine, a new back, a new shoulder, a new arm," and that "[Cuevas] and [Ramos's] spine is only going to get worse", among other comments. Notably, defense counsel's objections to these comments were sustained. Moreover, many of these comments, which focused on the continuing nature of Cuevas's and Ramos's injuries, were reasonable inferences based on the testimony of Ramos and Dr. Kurzydlowski. Ramos testified that she still suffers from back pain and that Cuevas still complains about back pain when he wakes up, and Dr. Kurzydlowski testified that Ramos and Cuevas's injuries were "indefinite" in nature. He also stated, "once a bad back, always a bad back." These comments provided a reasonable basis for Plaintiffs' counsel's comments about the ongoing nature of Ramos's and Cuevas's injuries and pain. Thus, although Plaintiffs were not allowed to pursue damages on the basis of permanency, the verdict forms allowed them to seek damages for the "pain

and suffering reasonably certain *to be experienced in the future* as a result of the injuries" Ramos and Cuevas sustained in the accident. (Emphasis added.)

¶ 38    Barron-Esparza also argues that Plaintiffs' counsel presented "irrelevant evidence in his power point presentation during closing argument," including "slides with quotes and text that lacked foundation and evidentiary value." However, when defense counsel objected to two slides that were shown to the jury, one that said, "causing this crash and the chaos that followed," and a second that contained an inaccurate jury instruction, the court sustained the objections and instructed Plaintiffs' counsel to take them down. The other objected-to PowerPoint slides were never seen by the jury, because the court sustained defense counsel's objections and instructed counsel for Plaintiffs to use only those slides that had been shown to the jury during trial. By sustaining defense counsel's objections, telling the jury, "I give the law, the attorneys don't. It's closing argument[,]" and instructing the jury that "if any statement of an attorney is not supported by the law or the evidence, you should disregard that statement or argument," the court cured any prejudice. See *People v. Campbell*, 2012 IL App (1st) 101249, ¶ 42 (finding that the trial court "cured the prejudice arising from the prosecutor's improper comments" and concluding that "those remarks d[id] not warrant a new trial" where the court "sustained defense counsel's objections to the comments and admonished the jury to disregard any opinions or personal beliefs expressed by the attorneys during arguments").

¶ 39    Barron-Esparza also complains about Plaintiffs' counsel's attempt to "inflame the passions of the jury" and to "try a case based upon sympathy and retribution rather than on properly admitted evidence." Barron-Esparza points to a number of comments by Plaintiffs' counsel, including his statements that "[a]t their most vulnerable point, when they needed peace of mind the most, the defendant took something from [Plaintiffs] that can never be replaced. Now, you are

all tasked with the responsibility of appraising what was taken from the plaintiffs" and "[w]hen something precious is wrongfully taken, all people have a burning desire for justice. And the way we address that universal need is to demand recognition *** in payment for the value of what was wrongfully taken." Although a jury must decide the case based on the evidence presented at trial and an attorney may not encumber it "by appeals to [its] passion, prejudice, or sympathy" (*Lorenz v. Siano*, 248 Ill. App. 3d 946, 953 (1993)), attorneys are afforded "wide latitude" in closing argument (*People v. Wheeler,* 226 Ill. 2d 92, 123 (2007)), and can "comment and argue based on the evidence presented at trial as well as draw any reasonable inferences from that evidence." *Sikora v. Parikh*, 2018 IL App (1st) 172473, ¶ 60. Misconduct during closing argument warrants a new trial only if it "deprive[s] a party of a fair trial such 'that the verdict might have been affected[.]' " *Id.* ¶ 73 (quoting *In re Estate of Mankowski*, 2014 IL App (2d) 140154, ¶ 63).

¶ 40    Here, Plaintiffs' counsel's closing argument could be characterized as passionate, but almost all of his comments could be construed as reasonable inferences based on the evidence presented, which makes this case distinguishable from those cases cited by Barron-Esparza, where counsel's misconduct was much more pervasive or intentional. See, *e.g., Rutledge v. St. Anne's Hospital*, 230 Ill. App. 3d 786, 790-91 (1992) (finding defense counsel's "willful[] disregard[]" of a stipulation and comments that "distorted and misrepresented the evidence and the law and [were] calculated to mislead" and "induce the jury into believing that plaintiff [was] hiding evidence" were so prejudicial that they denied plaintiff a fair trial); *Lee v. Calfa*, 174 Ill. App. 3d at 113 (finding defense counsel's misconduct "had the cumulative effect of substantially prejudicing plaintiff and depriving him of a fair trial" because he "belittl[ed]" an adversary, asked "improper and misleading" questions during trial and made "arguably improper" statements in opening and closing argument); *Belfield v. Coop,* 8 Ill. 2d 293, 312-13 (1956) (reversing and remanding for a

new trial based on attorney misconduct where the attorney characterized the defendants as "thieves," "usurpers," and "defrauders," belittled opposing counsel and inferred he was "not a reputable attorney" and yet "spoke with praise about [his firm's] own methods *** and [his firm's] high standards of ethics and conduct"). Moreover, the jury here was instructed that its duty was to "resolve this case by determining the facts based on the evidence and following the law given in the instructions" and that its verdict "must not be based on speculation, prejudice, or sympathy."

¶ 41    Although Barron-Esparza asserts that Plaintiffs' counsel engaged in a "premediated and planned attempt to circumvent the court's rulings" and that his misconduct was "plainly intentional," and the court expressed legitimate frustration with Plaintiffs' counsel's failure to comply with its orders multiple times, the court ultimately concluded that "Plaintiffs' counsel did not exhibit any intentionally abusive or unethical conduct." The record suggests that Plaintiffs' counsel was new to personal injury law and inexperienced in trying cases before a jury. At one point, the court asked him how many closing arguments he had made. At another point, the court remarked that he should "refer personal injury cases out" in the future. *Cf. Konewko v. Advocate Health and Hospitals Corporation*, 2020 IL App (2d) 190684, ¶ 75 (plaintiff argued that opposing counsel "deliberately tried to inflame the jury's passion" with improper closing argument because the attorney "knew the law and had been practicing with a 'good firm' for over 20 years"). Without the benefit of even a full transcript of the jury trial to review, "it is difficult to determine the precise impact of such misconduct." *Rutledge*, 230 Ill. App. 3d at 795. Accordingly, we defer to the trial court's assessment that Plaintiffs' counsel's errors were not intentional ones, and instead were attributable to his lack of experience. We also defer to its conclusion that sustaining defense counsel's objections and admonishing and properly instructing the jury cured any error tied to any misconduct, such that a new trial was not warranted. See *Sikora*, 2018 IL App (1st) 172473, ¶ 71

(deferring to the trial court's finding regarding the prejudice stemming from the attorney's comment "given its position of being present at the moment the error occurred compared to [the appellate court's] position of reviewing a cold record," reasoning that "the trial court was in the best position to measure the prejudicial effect on the jury and whether that prejudice was ameliorated by the objection and curative instruction"); *Bisset*, 119 Ill. App. 3d at 865 (according "great deference" to a trial court's decision to grant a motion for a new trial based on attorney misconduct because "the attitude and demeanor of counsel, as well as the atmosphere of the courtroom, cannot be reproduced in the record, and the trial court is in a superior position to assess and determine the effect of improper conduct on the part of counsel").

¶ 42    This was not a factually close case where evidence in the record could have supported a verdict for either party. It was undisputed that Barron-Esparza had a stop sign at the intersection of Cooper Avenue and Liberty Street and that Plaintiffs had no traffic controls, and Officer Linden testified, without objection, that Barron-Esparza had "the stop sign and the duty to yield to [Plaintiffs]." *Cf. Geisberger v. Quincy*, 3 Ill. App. 3d 437, 440 (1972) (reversing and remanding based on prosecutorial misconduct where the case was "factually close" and there was "evidence in the record to support a verdict for either party"); *Konewko v. Advocate Health and Hospitals Corporation,* 2020 IL App (2d) 190684, ¶¶ 2, 94 (reversing and remanding for a new trial based on counsel's improper comments during closing argument because the evidence was "closely balanced such that the jury could have reasonably returned a verdict for either side" and "ma[de] it highly probable that the repeated improper comments during closing arguments compromised the integrity of the verdict"). The jury's finding that Cuevas was 20% responsible for the accident and the fact that its damage awards came nowhere near the amounts suggested by Plaintiffs'

21

counsel during closing argument provide further proof that the jury based its verdict not on any improper comments by Plaintiffs' counsel, but on the properly admitted evidence at trial.

¶ 43    Taken together, we find no abuse of discretion, and affirm the trial court's decision to deny Barron-Esparza's motion for a new trial based on attorney misconduct.

¶ 44                                      B. Apportionment of Damages

¶ 45    Barron-Esparza argues that the trial court erred when it entered a judgment apportioning 100% of Ramos's damages to Barron-Esparza when the jury apportioned 20% liability to Cuevas. He argues that "equitable apportionment of damages [is] required by the Contribution Act" and the parties' agreement related thereto.

¶ 46    The Illinois Joint Tortfeasor Contribution Act (Contribution Act) (740 ILCS 100/1 et seq. (West 2022)) seeks to promote the "important public polic[y]" of "equitable apportionment of damages among tortfeasors." *Johnson v. United Airlines*, 203 Ill. 2d 121, 133 (2003). Section 100/2(a) of the Contribution Act states that "where 2 or more persons are subject to liability in tort arising out of the same injury to person or property, *** there is a right of contribution among them, even though judgment has not been entered against any or all of them." 740 ILCS 100/2(a) (West 2022). "Contribution between two tortfeasors is 'the enforcement of an equitable duty to share liability for the wrong done.' " *Saunders v. Orbitz Worldwide*, *LLC*, 2023 IL App (1st) 221018, ¶ 43 (quoting *Doyle v. Rhodes,* 101 Ill. 2d 1, 14 (1984)). Section (b) states, "No tortfeasor is liable to make contribution beyond his own pro rata share of the common liability." 740 ILCS 100/2(b) (West 2022). When there are joint tortfeasors, "ultimate liability for plaintiff's injuries" should be "apportioned on the basis of the relative degree to which [each tortfeasor's] conduct proximately caused them." *Skinner v. Reed-Prentice Division Package Machinery Co*., 70 Ill. 2d 1, 14 (1978).

¶ 47    Here, the verdict form for Ramos stated, "Assuming that 100% represents the total combined legal responsibility for all persons who proximately caused MONIKA RAMOS'S injury, we find the percentage of legal responsibility attributable to each as follows." The jury found Barron-Esparza 80% responsible for Ramos's injuries and Cuevas 20% responsible. After trial, however, the court did not apportion Ramos's damages to both Cuevas and Barron-Esparza, and instead entered judgment solely against Barron-Esparza for the entire $80,000 damages award to Ramos. But the parties had expressly agreed to "enter a verdict in proportion to the negligence" instead of "giving the 600 series" of the Illinois Pattern Jury Instructions on the apportionment of responsibility and contribution, because they feared the 600 series jury instructions would be overly complicated and "blow [the jury's] mind." During the jury instructions conference, defense counsel stated that "the verdict forms *** do apportion fault, and then your Honor can enter judgment based on the apportionment of negligence, rather than give the whole *** 600 series." Defense counsel added, "I think the *** idea was, Judge, *because we're apportioning the damages in the verdict form for [Ramos], the Court will just enter a judgment consistent with the apportionment of damage, rather than give the whole 600 series [of jury instructions]*." (Emphasis added.) The court then proposed a hypothetical where the jury found Barron-Esparza 60% liable and Cuevas 40% liable and asked, "what does that do to [Ramos's] money?" Defense counsel replied, "you enter 60 percent against my client, and 40 percent against [Cuevas]. *** [H]er damages don't get reduced based upon [Cuevas's] negligence. It's just who they are against, right? It's just who her damages would be against." The court said, "I can do that." It added, "I have this post-judgment agreement. So we use [Plaintiffs' counsel's] original Verdict form, right?" The parties agreed to do so and defense counsel confirmed that "the judge will enter a verdict in accordance with the jury's apportionment of liability negligence, attributable to [Barron-Esparza]

23

and *** Cuevas, and the Court will enter a verdict post-judgment *against each of those drivers*." (Emphasis added.) The court clarified that this related to "[t]he percentage of the damages" and said, "Okay. I can go along with that." Defense counsel reiterated that they "decided to do that ***instead of giving the jury the contributory 600 series [of Illinois Pattern Jury Instructions]."

¶ 48    The record reflects that the parties and the court agreed (1) to instruct the jury to apportion negligence between Barron-Esparza and Cuevas rather than give the 600 series of the Illinois Pattern Jury Instructions on apportionment of responsibility and contributory negligence, and (2) that judgment would be entered against Cuevas and Barron-Esparza "according to the apportionment of negligence" on Ramos's claim. Therefore, pursuant to the parties' agreement, judgment should have been entered that apportioned negligence consistent with the jury's verdict, which would have resulted in a $64,000 judgment for Ramos against Barron-Esparza and a $16,000 judgment for Ramos against Cuevas. But because Barron-Esparza failed to provide us with a transcript or a Bystander's Report of the June 14, 2023, hearing, we do not know why the court decided not to honor the earlier agreement.

¶ 49    It may be that the trial court declined to enforce the agreement because it runs contrary to the Contribution Act and, in the absence of any claim by Ramos against Cuevas, is unsupported by the pleadings. In Barron-Esparza's counterclaim, he asserted that he was "entitled to contribution from [Cuevas] for Monika Ramos." Yet the parties' agreement calls for a judgment to be entered *in favor of Ramos and against Cuevas* consistent with the jury's apportionment of liability negligence even though Ramos never brought a claim against Cuevas.

¶ 50    In the absence of a record, we may presume that the trial court's decision was correct. See *Foutch v. O'Bryant,* 99 Ill. 2d 389, 391-92 (1989) ("an appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the

24

absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis"). Nevertheless, there is no dispute about the parties' agreement regarding apportionment of liability. Under these unique circumstances, in the exercise of our authority, instead of enforcing the terms of the parties' agreement, which would require us to enter a judgment in favor of Ramos against Cuevas, we fashion an alternative remedy. See Ill. Sup. Ct. R. 366(a)(5) (eff. Feb. 1, 1994) (permitting a reviewing court to "enter any judgment and make any order that ought to have been given or made"). Because the parties agree that the jury found Cuevas 20% responsible for Ramos's injuries, Barron-Esparza is entitled to contribution from Cuevas for his *pro rata* share of Ramos's injuries. Therefore, we remand with instructions for the trial court to vacate Cuevas's damages award and enter a new damages award of $48,000 for Cuevas against Barron-Esparza, which is commensurate with the jury's apportionment of negligence and takes into consideration Barron-Esparza's contribution claim. We uphold the $80,000 damages award for Ramos against Barron-Esparza. Thus, the total damages against Barron-Esparza in this case amount to $128,000, plus prejudgment interest.

¶ 51                                    III. CONCLUSION

¶ 52    For the foregoing reasons, the judgment of the trial court is affirmed in part and the matter is remanded to the trial court to enter judgment consistent with this decision.

¶ 53    Affirmed in part and remanded with instructions.